MAURA C. FAHEY, OSB No. 133549
maura@crag.org - (503) 525-2722
RALPH O. BLOEMERS, OSB No. 984172
ralph@crag.org - (503) 525-2727
EMMA A.O. BRUDEN, OSB No. 163525
emma@crag.org - (503) 525-2725
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **AUDUBON SOCIETY OF PORTLAND**, an Oregon non-profit corporation, **OREGON WILD**, an Oregon non-profit corporation, and **WATERWATCH OF OREGON**, an Oregon non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **SALLY JEWELL**, in her official capacity as Secretary of United States Department of Interior; **DANIEL M. ASHE**, in his official capacity as Director of United States Fish and Wildlife Service; and the **UNITED STATES FISH AND WILDLIFE SERVICE**, a federal agency of the United States Department of the Interior, <br><br> Defendants. | Case No. 1:17-cv-00069 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (5 U.S.C. § 706(2)) <br><br><br> (Environmental Matters – National Environmental Policy Act, Kuchel Act, National Wildlife Refuge Improvement Act, Clean Water Act, Administrative Procedures Act) |

## NATURE OF ACTION

1.     Plaintiffs AUDUBON SOCIETY OF PORTLAND, OREGON WILD, and

WATERWATCH OF OREGON (collectively "Plaintiffs") challenge the January 17, 2017

issuance of the Record of Decision ("ROD") for the Final Comprehensive Conservation Plan

("CCP") and Final Environmental Impact Statement ("FEIS") (collectively the "Plan") prepared

by Defendants SALLY JEWELL, Secretary of the Interior, DANIEL M. ASHE, Director of the

U.S. Fish and Wildlife Service, and the U.S. FISH AND WILDLIFE SERVICE (collectively the

"Service" or "Defendants") pursuant to the following federal laws: Administrative Procedure Act

("APA"), 5 U.S.C. §§ 551–559, 701–706, 1305, 3105, 3344, 4301, 5335, 5372, 7521 (2016);

National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370h (2016);

Kuchel Act of 1964, 16 U.S.C. §§ 695k–695r (2016); National Wildlife Refuge System

Administration Act, as amended by the National Wildlife Refuge System Improvement Act

("Refuge Act"), 16 U.S.C. §§ 668dd–668ee (2016); and Clean Water Act ("CWA"), 33 U.S.C.

§§ 1251–1387 (2016).

2.     The Plan applies to five National Wildlife Refuges ("Refuges") within the

Klamath Basin National Wildlife Refuge Complex ("Klamath Basin Complex"): Lower

Klamath, Upper Klamath, Tule Lake, Clear Lake, and Bear Valley.

3.     The five Refuges covered by the Plan are some of the most important parcels of

waterfowl habitat in North America.  The Klamath Basin Complex encompasses approximately

200,000 acres of land adjoining the border dividing Oregon and California.  Prior to settlement

and the introduction of agriculture to the area, the Klamath Basin included 185,000 acres of

wetlands, lakes, and marshes.  As a result of the development of commercial agriculture in the

region, spurred further by the initiation of the federal Klamath Reclamation Project in 1905,

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

80 percent of the wetlands in the Klamath Basin have been drained and eliminated.  The Klamath

Basin Complex was established to preserve the remaining waterfowl habitat and ensure a future

for wildlife in the area.  The Klamath Basin Complex currently provides important habitat for

many species of migratory birds and waterfowl, including federal and state listed threatened and

endangered species, and an estimated 80 percent of Pacific Flyway waterfowl pass through the

Klamath Basin during their migration.

4.      Persistent drought conditions and significant climatic changes threaten the

remaining wetlands and wetland-dependent species.  Despite these climatic changes and drought

conditions, the Service continues to authorize commercial agricultural leasing within the

boundaries of the Refuges and authorize the use of its limited water resources for growing

agricultural crops, further compounding the impact of water deprivation on the wetlands and

wildlife.

5.      The Service's management of the Refuges has reduced wetland habitat for

important bird migrations on the Pacific Flyway, increased disease, and increased the distribution

of noxious weeds instead of plants suitable for waterfowl.

6.      Defendants have failed to meet their procedural and substantive duties under

federal environmental law, including by: (1) failing to consider a reasonable range of alternatives

and failing to disclose and assess the direct, indirect, and cumulative impacts of the Plan in

violation of NEPA; (2) issuing a plan that is inconsistent with the mandate of the Kuchel Act to

manage the Refuges for the major purpose of waterfowl management; (3) authorizing the

continuation of the incompatible agricultural leasing program on Lower Klamath and Tule Lake

Refuges; (4) failing to create a plan that provides for conservation of wildlife and their habitats;

ensures the maintenance of biological integrity, diversity, and environmental health; and ensures

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

adequate water quantity and water quality to fulfill the Refuge System mission and Refuge purposes; (5) transferring authority over administration of the agricultural leasing program to the Bureau of Reclamation; and (6) violating the CWA and state water quality standards that limit agricultural pollution.

7.      Plaintiffs seek a declaration that Defendants' issuance of the ROD approving the Plan violates NEPA, the Kuchel Act, the Refuge Act, the CWA, and the APA.  To remedy the violations of federal laws, Plaintiffs request that this Court vacate the ROD and the Plan and remand to the Service for further consideration.  Additionally, Plaintiffs request that this Court enjoin the Secretary from renewing or extending agricultural leases on the Lower Klamath and Tule Lake Refuges unless and until the Service issues a Plan consistent with applicable law.

8.      Should Plaintiffs prevail, Plaintiffs will seek reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims present a federal question, 28 U.S.C. § 1346 because Plaintiffs' claims involve the United States as a defendant, and 28 U.S.C. § 1367 because violations of state water quality standards are part of the same case or controversy.  A present, actual, and justiciable controversy exists between the parties.  The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

10.      Plaintiffs submitted comments on the draft and final Plan, and the challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.  The Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this judicial district and a substantial part of the land and waters at issue are within this judicial district.  Plaintiffs each reside in and maintain their primary place of business in this judicial district.  Three of the five Refuges at issue in this action are located entirely or partially within this judicial district, including Upper Klamath Refuge, Bear Valley Refuge, and portions of Lower Klamath Refuge.

## PARTIES

### Plaintiffs

12.     Plaintiff AUDUBON SOCIETY OF PORTLAND ("Portland Audubon") is a nonprofit organization with over 15,000 members.  Portland Audubon was founded in 1902 in part to help establish the Klamath National Wildlife Refuges.  Portland Audubon's mission is to promote the understanding, enjoyment, and protection of native birds, other wildlife, and their habitats.  Portland Audubon and its members are being, and will be, adversely affected by Defendants' actions complained of herein.

13.     Portland Audubon engages in conservation work to protect and advocate for birds and other wildlife in Oregon and throughout the Klamath Basin region.  Portland Audubon also provides education to its members and the public, maintains nature sanctuaries to protect habitat and ecosystems, and organizes birding and natural history activities.  Restoring and protecting the health of the Klamath Basin Complex is of paramount importance to managing the continued health of birds that rely on wetlands along the Pacific Flyway.  Portland Audubon has focused its resources on the Klamath Basin and tracked the drought and climatic changes that have significantly and severely altered water resources in the Klamath Basin.  Portland Audubon

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 4

advocates for the restoration of the Klamath Basin and provides education and information to its members and the public through action alerts, press releases, fact sheets, reposting of letters to lawmakers, field trips to the Klamath Basin Complex, and information distributed by Service staff relating to the Klamath Basin Complex.

14. Portland Audubon's primary concerns are the protection of remaining waterfowl and waterbird habitat and wetlands in the Klamath Basin Complex. Portland Audubon has members that regularly visit, use, and enjoy the Klamath Basin Complex for bird watching and other recreational, aesthetic, scientific, educational, and spiritual purposes, and Portland Audubon's members will continue to do so on a regular basis indefinitely into the future. Agricultural use of leased refuge lands and related water shortages pose an ongoing threat to the Klamath Basin Complex's remaining wetlands and the birds that depend on them and therefore to the interests of Portland Audubon and its members. Defendants' decision to issue a Plan that violates federal laws directly harms these interests of Portland Audubon and its members.

15. Plaintiff OREGON WILD is a nonprofit organization with approximately 13,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon, and has field offices in Eugene, Oregon; Enterprise, Oregon; and Bend, Oregon. Oregon Wild and its members are being, and will be, adversely affected by the Service's decision to approve the Plan.

16. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild has a program specifically focused on restoring balance to the Klamath Basin to protect fish, wildlife, and water resources. For nearly two decades, Oregon Wild has been a leading voice for conservation in the Klamath Basin. The interests of Oregon Wild and its members in observing and enjoying the wildlife in

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 5

and around the Klamath Basin Complex are dependent, and will continue to be dependent, on the maintenance of healthy and viable wildlife habitat and water resources within the Klamath Basin Complex, and a conservation plan protecting wetlands, waterfowl, and wildlife will enhance those interests.

17.     To achieve its goals, Oregon Wild disseminates a wide array of educational and informational materials addressing the issues surrounding wildlife and water resources in the Klamath Basin Complex to government agencies, members of Congress, and the general public. These materials include, but are not limited to, fact sheets, white papers, letters to Congress, press releases, reprints of news articles, and action alerts.  Oregon Wild is part of a coalition of water conservation and wildlife organizations with extensive expertise in the Klamath Basin that has urged managers and lawmakers to address the worsening water shortages that are negatively impacting fish and wildlife in the Tule Lake and Lower Klamath Refuges.

18.     The Service's issuance of an unlawful Plan for each of the units of the Klamath Basin Complex injures Oregon Wild and its members by interfering with, among other things, their aesthetic enjoyment of the Klamath Basin Complex and its inhabitants.  Without a lawful Plan that considers alternatives consistent with the major purposes stated in federal law and the changed climatic circumstances, the Service continues to allow harmful activities like commercial agricultural leasing, which involves pesticide and herbicide use and excessive irrigation withdrawals that directly, indirectly and cumulatively degrade conditions for waterfowl and other wildlife that depend on the functioning habitat that remains in the Klamath Basin Complex.  Defendants' failure to manage the Klamath Basin Complex for the major purpose of protecting waterfowl and wildlife habitat and aquatic resources compromises members' enjoyment of the Refuges.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

19.     Plaintiff WATERWATCH OF OREGON ("WaterWatch") is a nonprofit water and river conservation organization devoted to restoring and protecting natural flows in Oregon's rivers to sustain native fish, wildlife, and the people who depend on healthy rivers.  WaterWatch has its main office in Portland, Oregon, and maintains a field office and staff presence in southern Oregon.  For over a decade, WaterWatch has devoted its time and expertise to advocating for restoring the Klamath Basin by bringing water demand back into balance with the natural abilities of the system to ensure sufficient water for fish, wildlife, wetlands, and the Klamath Basin Complex.  WaterWatch works to increase legal compliance and agency accountability on water allocations and other management decisions that affect the Klamath Basin.

20.     WaterWatch achieves its goals by holding regulators accountable, working with lawmakers to pass balanced water legislation, educating the public, submitting testimony and comments to lawmakers and agencies, and when necessary, litigating on behalf of the public interest in healthy rivers.  Many members and supporters of WaterWatch visit and enjoy the lands and waters in the Klamath Basin, including the Klamath Basin Complex, to engage in hiking, fishing, hunting, photography, education, watershed research, and wildlife observation. Defendants' failure to comply with its legal obligations in managing the Klamath Basin Complex injures WaterWatch's members' use and enjoyment of the region.  For example, by favoring water deliveries for refuge agricultural leases over refuge wetlands during drought, current management reduces or eliminates important refuge habitats and dependent populations of fish and wildlife, thereby reducing or eliminating the enjoyment of these refuge amenities by WaterWatch members.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

21.     Each Plaintiff has standing to bring this action on behalf of themselves and their members.  Members of Plaintiff organizations live near and enjoy the use of the Klamath Basin Complex and the individual refuges affected by Defendants' action, and they will continue to visit and enjoy the resources of the five Refuges at regular times indefinitely into the future.  The educational, scientific, aesthetic, conservation, and recreational interests of the Plaintiff organizations and their members have been and will continue to be adversely affected and irreparably injured by Defendants' decision to approve an unlawful Plan.

22.     On behalf of their members, Plaintiffs brought suit against the Service in April 2014 to compel the Service to comply with the statutory deadline for completing Comprehensive Conservation Plans for each of the five Refuges.  The Service agreed that its failure to prepare a CCP(s) for these Refuges was a violation of the Refuge Act but disagreed on the appropriate timeline for completing the CCP(s).  The District Court for the District of Oregon granted Plaintiffs' motion for summary judgment and requested remedy, ordering that the Service complete the CCP(s) for these five Refuges by August 1, 2016.  *Audubon Soc'y of Portland v. Jewell*, 104 F. Supp. 3d 1099, 1101 (D. Or. 2015) (order extending deadline to January 17, 2017 issued on June 6, 2016, Docket No. 46).

23.     Since the court's order, Plaintiffs have participated extensively in the relevant administrative actions and have actively participated in the public process leading up to the Service's decision to approve the Plan.  On August 4, 2016, Plaintiffs submitted extensive comments, including four expert reports, detailing the legal issues associated with the draft Plan and suggesting additional alternatives for inclusion in the Plan.  On January 6, 2017, Plaintiffs submitted additional comments on the final Plan.  Despite these extensive comments, in

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

approving the final Plan, the Service failed to address many of the issues Plaintiffs raised

regarding the Plan, and consequently, Plaintiffs are filing this suit to remedy the legal violations.

**Defendants**

24.    Defendant SALLY JEWELL is the Secretary of the U.S. Department of the

Interior ("Secretary").  The Secretary is the official ultimately responsible for the Klamath Basin

Complex management and for compliance with all laws applicable to the Klamath Basin

Complex, including the APA, NEPA, CWA, Kuchel Act, and Refuge Act.

25.    Defendant DANIEL M. ASHE is the Director of the U.S. Fish and Wildlife

Service ("Director").  He is legally responsible for overseeing the Service's activities, including

the development of comprehensive conservation plans under the Refuge Act.  He is sued in his

official capacity.

26.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the federal

agency responsible for national wildlife refuge management and operation and charged with

ensuring refuges are in compliance with the regulations and laws that govern them, including the

APA, NEPA, CWA, Kuchel Act, and Refuge Act.  The Service's mission is to conserve, protect,

and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American

people.

## LEGAL BACKGROUND

**Administrative Procedure Act**

27.    The APA confers a right of judicial review on any person adversely affected by

agency action within the meaning of a relevant statute.  5 U.S.C. § 702.  NEPA, the CWA, the

Kuchel Act, and the Refuge Act do not provide an independent standard of review and

consequently are reviewed under the APA.  Upon review, a court shall "hold unlawful and set

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

aside agency action . . . found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2).

**National Environmental Policy Act**

28.    NEPA is our nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's primary purposes are to insure fully informed decision-making and to provide for public participation in environmental analyses and decision-making before making decisions and taking action. 40 C.F.R. § 1500.1(b), (c).

29.    To achieve these purposes, NEPA requires every federal agency to prepare an environmental impact statement ("EIS") for "all major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement must describe the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided if the action is implemented, alternatives to the proposed action, the relationship between short term uses of the environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitment of resources that would occur if the action is implemented. 42 U.S.C. § 4332(2)(C).

30.    The Council on Environmental Quality ("CEQ"), a federal agency established pursuant to NEPA, promulgated regulations implementing NEPA and elaborating on the requirements of an EIS. *See* 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (CEQ's NEPA regulations).

31.    Considering a reasonable range of alternatives is one of NEPA's most central requirements. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1502.14, 1508.9(b). Within the alternatives analysis, the agency must rigorously explore and objectively evaluate all reasonable alternatives. 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1502.14(a), 1502.14(d), 1508.9(b). This

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

"[i]ncludes reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(c). The agency must explain its reasons for eliminating alternatives from detailed study.

32. A No Action alternative must always be included in a NEPA assessment and is analyzed to establish baseline environmental conditions and predictable outcomes of other actions that may result from the selection of the No Action alternative. 40 C.F.R. § 1508.14(d). It is a means by which to draw comparisons between action alternatives and their respective impacts on the environment.

33. NEPA requires adequate disclosure of all environmental impacts and specifically requires federal agencies to consider the direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. §§ 1501.2(b), 1508.7–.8. Direct impacts are those that are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8(a). Indirect impacts are also caused by the action, but occur later in time or farther removed in distances. 40 C.F.R. § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." 40 C.F.R. § 1508.7.

34. The CEQ recently established that "[c]limate change is a fundamental environmental issue, and its effects falls squarely within NEPA's purview." Memorandum from Christina Goldfuss, Council on Envtl. Quality, on Final Guidance for Fed. Dep'ts and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Review (Aug. 1, 2016) ("Climate Change Memo") at 2. Specifically, "the effects of climate change observed to date and projected to occur in the future include . . .

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

increased drought, . . . harm to water resources, . . . and harm to wildlife and ecosystems." Climate Change Memo at 9.

35.    Thus, "Federal agencies should . . . take into account the ways in which a changing climate may impact the proposed action and any alternatives, change the action's environmental effects over the lifetime of those effects, and alter the overall environmental implications of such actions."  Climate Change Memo at 9.

36.    The federal agency's NEPA analysis of climate change impacts "should focus on those aspects of the human environment that are impacted by the both a proposed action and climate change [because] . . . [c]limate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change."  Climate Change Memo at 21.

37.    "This increase in vulnerability can exacerbate the effects of the proposed action. For example, a proposed action may require water from a stream that has diminishing quantities of available water because of decreased snow pack in the mountains, or add heat to a water body that is already warming due to increasing atmospheric temperatures.  Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change.  They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions."  Climate Change Memo at 21–22.

38.    Overall, the NEPA documentation must provide the decision maker and the public with adequate information, evidence and analysis to fully assess the potential impacts of the proposed action.  40 C.F.R. § 1508.9.  Though certain parts of the analysis may be incorporated

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

by reference, such information must be cited, described, and reasonably available for public review.  40 C.F.R. § 1502.21.  Accurate scientific analysis and public scrutiny are essential to implementing NEPA.  40 C.F.R. § 1500.1(b).

**Kuchel Act**

39.    The Upper Klamath, Lower Klamath, Clear Lake, and Tule Lake Refuges are governed by the Kuchel Act.  16 U.S.C. §§ 695k–r.  The purpose of the Kuchel Act is "to promote the conservation of the Nation's wildlife resources on the Pacific flyway" within the Tule Lake, Lower Klamath, Upper Klamath, and Clear Lake Refuges.  Pub. L. 88-567, 78 Stat. 850 (Sept. 2, 1964).  In the Kuchel Act, Congress established four purposes for the Upper Klamath, Lower Klamath, Clear Lake, and Tule Lake Refuges: (1) "to preserve intact the necessary existing habitat for migratory waterfowl in this vital area of the Pacific flyway," (2) "to prevent depredations of migratory waterfowl on the agricultural crops in the Pacific Coast States," (3) "dedicated to wildlife conservation . . . for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith," (4) "for waterfowl purposes, including the growing of agricultural crops by direct planting and sharecrop agreements with local cooperators where necessary . . . ."  16 U.S.C. §§ 695k, 695*l*, 695n.

40.    The Kuchel Act established a fifth purpose for the Lower Klamath and Tule Lake Refuges, to, "consistent with proper waterfowl management, continue the present pattern of leasing the reserved lands . . . ." 16 U.S.C. § 695n.

**National Wildlife Refuge System Administration Act and National Wildlife Refuge System Improvement Act**

41.    The National Wildlife Refuge System Administration Act, as amended by the National Wildlife Refuge System Improvement Act, governs the management of all refuges and

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 13

delegates management authority to the Secretary through the Service.  *See* 16 U.S.C.

§ 668dd(a)(1).

42.    The Refuge Act establishes the mission of the Refuge System "to administer a

national network of lands and waters for the conservation, management, and where appropriate,

restoration of the fish, wildlife, and plant resources and their habitats within the United States for

the benefit of present and future generations of Americans."  16 U.S.C. § 668dd(a)(2).  "[E]ach

refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for

which that refuge was established . . . ."  16 U.S.C. § 668dd(a)(3)(A).  The Refuge Act defines

"purposes of the refuge" as the "purposes specified in or derived from the law, proclamation,

Executive order, agreement, public land order, donation document, or administrative

memorandum establishing, authorizing, or expanding a refuge, refuge unit, or refuge subunit."

16 U.S.C. § 668ee(10).

43.    To achieve the purposes of the Refuge Act, the Secretary is directed to "provide

for the conservation of fish, wildlife, and plants, and their habitats within the System . . . ."

16 U.S.C. § 668dd(a)(4)(A).  The Secretary must "ensure that the biological integrity, diversity,

and environmental health of the System are maintained for the benefit of present and future

generations of Americans" and "ensure that the mission of the System . . . and the purposes of

each refuge are carried out . . . ."  16 U.S.C. § 668dd(a)(4)(B), (D).

44.    The Refuge Act includes a substantive obligation to both "assist in the

maintenance of adequate water quantity and water quality to fulfill the mission of the System and

the purposes of each refuge" and "acquire, under State law, water rights that are needed for

refuge purposes."  16 U.S.C. § 668dd(a)(4)(F)–(G).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 14

45.    The Service is "authorized . . . to permit the use of any area within the System for any purpose . . . whenever [it] determines that such uses are compatible with the major purposes for which such areas were established."  16 U.S.C. § 668dd(d)(1)(A).

46.    The Service "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of the refuge unless the Secretary has determined that the use is a compatible use and that the use is not inconsistent with public safety."  16 U.S.C. § 668dd(d)(3)(A)(i).

47.    A compatible use is a "wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1).

48.    Refuge uses are evaluated in compatibility determinations ("CDs").  The Director delegates authority to make CDs through the Regional Director or the refuge manager.  Sound professional judgment must be "consistent with principles of sound fish and wildlife management and administration, [and] available science and resources . . . ."  16 U.S.C. § 668ee(3).

49.    In determining whether a use is compatible, "[t]he refuge manager must consider not only the direct impacts of the use but also the indirect impacts associated with the use and the cumulative impacts of the use when conducted in conjunction with other existing or planned uses on the refuge, and uses of adjacent lands or waters that may exacerbate the effects of a refuge use."  U.S. Fish & Wildlife Serv., The Fish and Wildlife Service Manual: Compatibility, Part 603 FW 2, § 2.11(B)(3) (2000).

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

50.     A conflict from a proposed use that is incompatible with a refuge's purposes "shall be resolved in a manner that first protects the purposes of the refuge, and, to the extent practicable, that also achieves the mission of the System."  16 U.S.C. § 668dd(a)(4)(D).  Uses that are reasonably anticipated "to reduce the quality or quantity or fragment habitats on a national wildlife refuge will not be compatible."  603 FW 2, § 2.5(A).

51.     The Service's compatibility policy provides that the Service "will not allow compensatory mitigation to make a proposed refuge use compatible….  If the proposed use cannot be made compatible with stipulations [the Service] cannot allow the use."  603 FW 2, § 2.11(C)

52.     The Refuge Act requires the Service to "prepare a comprehensive conservation plan . . . for each refuge," and subsequently revise the plans every 15 years.  16 U.S.C. § 668dd(e)(1)(A), (B).  This plan is to "describe[] the desired future conditions of a refuge or planning unit and provide long-range guidance and management direction to achieve the purposes of the refuge."  50 C.F.R. § 25.12.

53.     In developing a comprehensive conservation plan, the Secretary "shall identify and describe" several factors, including: "the purpose of each refuge comprising the planning unit;" "the distribution, migration patterns, and abundance of fish, wildlife and plant populations and related habitats within the planning unit;" "significant problems that may adversely affect the populations and habitat of fish, wildlife and plants within the planning unit and the actions necessary to correct or mitigate such problems;" and "opportunities for compatible wildlife-dependent recreational uses."  16 U.S.C. § 668dd(e)(2).

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

**Clean Water Act**

54.     The Federal Water Pollution Control Act ("Clean Water Act" or "CWA")
establishes a comprehensive program "to restore and maintain the chemical, physical, and
biological integrity of the Nation's waters."  33 U.S.C. § 1251.  The CWA seeks to attain "water
quality which provides for the protection and propagation of fish, shellfish and wildlife."
33 U.S.C. § 1251(a)(2).

55.     To achieve the goal of water quality, Section 303(d) of the CWA requires states to
develop water quality standards that establish and protect the desired conditions of each
waterway within the state's regulatory jurisdiction.  33 U.S.C. § 1313(a).  Water quality
standards must be sufficient to "protect the public health or welfare, enhance the quality of
water, and serve the purposes of [the CWA]."  33 U.S.C. § 1313(c)(2)(A).

56.     Water quality standards have three elements: (1) one or more designated "uses" of
a waterway; (2) numeric and narrative "criteria" specifying the water quality conditions, such as
maximum amount of toxic pollutants, that are necessary to protect the designated uses; and (3)
an antidegradation policy that ensures "[e]xisting instream water uses and the level of water
quality to protect the existing uses [will] be maintained and protected" and that high quality
waters will be maintained and protected.  33 U.S.C. § 1313; 40 C.F.R. Part 131, Subpart B.  Each
element of a water quality standard is a legal requirement that must be met.

57.     Regarding the "criteria," the CWA requires that "[e]ach State shall identify those
waters within its boundaries for which the effluent limitations required by . . . this title are not
stringent enough to implement any water quality standard applicable to such waters."  33 U.S.C.
§ 1313(d)(1)(A).  After identifying the impaired waters, a state must then establish the Total
Maximum Daily Load ("TMDL") for those pollutants identified by the EPA.  33 U.S.C.

§ 1313(d)(1)(C).  These loads "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety . . . ." 33 U.S.C. § 1313(d)(1)(C).

58.    Section 313 requires all federal agencies to comply with state water quality standards.  33 U.S.C. § 1323(a).

59.    Federal agencies must ensure that any authorized activity on federal lands complies with all applicable water quality standards.

60.    The Klamath River Basin—including the Lost River, which flows through Lower Klamath and Tule Lake Refuges—is identified as impaired pursuant to Section 303(d).  In 2008, EPA established a TMDL for the Lost River.  For the TMDL, the hydrologic system was divided into four segments: 1) the Lost River, which feeds into: 2) Tule Lake Refuge, where water is pumped into: 3) Lower Klamath Refuge, where water is pumped into: 4) the Klamath Straits Drain, and then on to the Klamath River.

61.    The TMDL assigns load allocations ("LAs") to the Service for pollution from agricultural runoff and irrigation return flows within both the Lower Klamath and Tule Lake Refuges that must result in a 50% reduction of current pollution.  The Lost River TMDL identifies the maximum quantities of dissolved inorganic nitrogen ("DIN") and carbonaceous biochemical oxygen demand ("CBOD") that can be delivered to the system without jeopardizing compliance with water quality standards.  The Lost River TMDL Action Plan assigned additional responsibilities to the Service.

62.    The Klamath Straits Drain is identified as impaired and is on the State of Oregon's 303(d) list for ammonia and dissolved oxygen year-round, and chlorophyll *a* in summer.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 18

## FACTUAL BACKGROUND

63.    The Klamath National Wildlife Refuge Complex consists of six refuges, including the Upper Klamath, Lower Klamath, Tule Lake, Clear Lake, Bear Valley, and Klamath Marsh Refuges.  The Service's management of five of the six refuges—Upper Klamath, Lower Klamath, Tule Lake, Clear Lake, and Bear Valley—is at issue in this case.

64.    Historically, the Klamath Basin contained approximately 185,000 acres of shallow lakes, wetlands and freshwater marshes that supported populations of over six million water birds, a category of birds that includes waterfowl, as well as all other birds that inhabit a water environment, like shorebirds, grebes, rails, herons, gulls, pelicans, and cormorants.  The Plan defines waterfowl as "[a] group of birds that include ducks, geese, and swans."

65.    The Klamath Refuge Complex was established to conserve the Klamath Basin's remaining wetland habitat.  However, the Upper Klamath, Lower Klamath, Tule Lake, and Clear Lake Refuges are part of the U.S. Bureau of Reclamation ("Reclamation") Klamath Project and were subject to conversion from wetland habitats to agricultural fields.

66.    Despite Executive actions establishing the Refuges for wildlife and waterfowl conservation, agricultural and homesteading use was still pervasive on these lands, and draining the marshes and lakes within the Refuges continued.  Today, less than 25 percent of the historic wetlands and marshes remain in the Klamath Basin.

67.    In the 1950s, Reclamation proposed transferring areas of the Refuges to private ownership for homesteading purposes.  In response, Congress enacted the Kuchel Act in 1964 to halt wetland reclamation on the Refuges, maintain federal ownership and dedicate the lands to the wildlife conservation to be administered for the major purpose of waterfowl management.  Today, the Service and Reclamation administer a Public Lease Lands program on the Lower

Klamath and Tule Lake Refuges.  Refuge lands are also subject to agriculture under permits granted in cooperation with the Service.

68.    The Klamath Basin Complex continues to provide important habitat for waterfowl and other wildlife.  In the summer, it provides crucial habitat to molting waterfowl, when most adult birds are flightless for a 30-day period.  Breeding and molting waterfowl rely on seasonal and permanent wetlands and vegetation in the Klamath Basin Complex.  Many waterfowl rely on the wetlands for their needed protein-rich diet, protein which agricultural crops cannot provide.

69.    Each of the five Refuges covered by the Plan has a unique history, which shapes the purpose for each individual Refuge.

**Upper Klamath Refuge**

70.    Upper Klamath National Wildlife Refuge was established in 1928 and is a 15,000-acre refuge located in southwestern Oregon.  The Upper Klamath Refuge is comprised mostly of bulrush-cattail marsh and open water and approximately 30 acres of forested uplands.  The Refuge provides important nesting and brood rearing habitat for ducks and other waterfowl.  The ecological function in this area has changed drastically in recent years, with the Upper Klamath Lake progressing to a hypertrophic condition characterized by increases in algal abundance and changes in algal composition.  This likely resulted from (1) the draining of marshland around the lake, (2) a decrease of forested area in the Basin, and (3) an increase of agricultural land use.

71.    Under Executive Order 4851, President Calvin Coolidge reserved 7,560 lands as the Upper Klamath Refuge on April 3, 1928 "as a refuge and breeding ground for birds and wild animals."  These lands were, however, "subject to the use thereof by [Reclamation] for irrigation and other incidental purposes, and to any other valid existing rights."

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

72.     The federal government expanded the Upper Klamath Refuge by withdrawing and reserving additional land in 1951, 1957, 1964, 1968, 2005, and 2010.  In 2005 and 2010, the Service expanded the boundaries of the refuge, including transferring land from Reclamation to the Service for the purposes of increasing water storage, restoring wetlands, improving water quality in the Upper Klamath Lake, and benefiting endangered Lost River and shortnose suckers, as well as other wildlife.

73.     In addition to the purposes established by the executive orders, as discussed above, the Kuchel Act added four purposes to the Upper Klamath Refuge, all relating to and underscoring the importance of waterfowl and wildlife conservation.  *See supra* ¶ 39.

74.     The Migratory Bird Conservation Act states that the Upper Klamath Refuge is intended "for use as an inviolate sanctuary, or for any other management purpose, for migratory birds," adding another purpose to the Upper Klamath Refuge.  16 U.S.C. § 715d.

75.     The Endangered Species Act ("ESA") added one final purpose for the Upper Klamath Refuge: "to conserve . . . fish or wildlife which are listed as endangered species or threatened species . . . or . . . plants." 16 U.S.C. § 1534.

76.     The Upper Klamath Refuge remains important habitat for a host of nesting waterbirds including western grebes, white pelicans, black-crowned night-herons, great egrets, and a host of waterfowl species.

**Lower Klamath Refuge**

77.     Lower Klamath National Wildlife Refuge was the nation's first waterfowl refuge, established on August 8, 1908 by President Theodore Roosevelt through Executive Order 924. Executive Order 924 "reserved and set aside" land "as a preserve and breeding ground for native birds."  Several subsequent executive orders modified the boundaries of the Lower Klamath

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

Refuge.  *See* Executive Order 2200 (May 14, 1915) (President Woodrow Wilson); Executive Order 3187 (December 2, 1919) (President Woodrow Wilson); Executive Order 3422 (March 28, 1921) (President Warren Harding); Executive Order 8475 (July 10, 1940) (President Franklin D. Roosevelt).  Lower Klamath Refuge is a 46,000-acre refuge located in southern Oregon and northeastern California.

78.    The executive orders and subsequent legislation confirmed the purpose of the Lower Klamath Refuge.  For example, Executive Order 2200 established the purpose as "protection of native birds."

79.    The Kuchel Act added five purposes to the Lower Klamath Refuge that focus on waterfowl and wildlife conservation, allowing continued agricultural leasing only to the extent consistent with proper waterfowl management.  *See supra* ¶¶ 39, 40 (describing the five purposes for the Lower Klamath Refuge under the Kuchel Act).

80.    The Migratory Bird Conservation Act established a purpose for the Lower Klamath Refuge "for use as an inviolate sanctuary, or for any other management purpose, for migratory birds."  16 U.S.C. § 715d.

81.    Historically, the Lower Klamath Lake was identified as one of the largest lake and marsh habitats in the Klamath Basin, providing significant wildlife resources.  The potential for agricultural development was realized and pursued, and, with those developments, a long history of conflict between development and resource protection began.

82.    Today, the Lower Klamath Refuge remains one of the most important breeding grounds for waterfowl, supporting one of the densest breeding populations of waterfowl in the Refuge System, producing between 30,000 and 60,000 waterfowl annually, as well as producing a variety of colonial nesting water birds.  Approximately 80 percent of Pacific Flyway migrating

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

waterfowl pass through the Klamath Basin, with 50 percent of those birds using the Lower Klamath Refuge.

83.     Approximately 5,500 acres of the Lower Klamath Refuge are leased for commercial agriculture under the Public Lease Lands program.  Another 3,500-5,000 acres are farmed under permits in cooperation with the Service.  Water within the Refuge is delivered through a system of diversion or irrigation canals associated with the Klamath Project.  Due to over-allocation of water within the system, drought conditions, and climatic changes, the Refuge often faces water shortages, which, since 2010, has become particularly evident as water deliveries have been reduced to levels well below what is necessary to sustain breeding and migratory wildlife on the Refuge.

**Tule Lake Refuge**

84.     Tule Lake National Wildlife Refuge is a 39,116-acre refuge located in the Tule Lake Basin of northeastern California.  President Calvin Coolidge established the Tule Lake Refuge on October 1928 by Executive Order 4975, which "reserved and set apart . . . [the area] as a refuge and breeding ground for birds."  On November 3, 1932, Executive Order 5945, signed by President Herbert Hoover, subsequently enlarged the Tule Lake Refuge, reiterating the refuge's primary purpose "as a refuge and breeding ground for wild birds and animals."  Executive Order 7341, signed by President Franklin D. Roosevelt on April 10, 1936, further enlarged the Tule Lake Refuge to its present size.

85.     In addition to the direction provided by the executive orders, the Tule Lake Refuge has the same five purposes from the Kuchel Act as the Lower Klamath Refuge.  *See supra* ¶¶ 39, 40.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

86.    Historically, Tule Lake was one of the largest lake and marsh habitats, providing important habitat for many waterfowl, waterbirds, and fish, including osprey and suckers.  This changed when federal legislation in the late 1800s and early 1900s encouraged "reclamation" of these lands, and the area was extensively developed for agriculture.  Today, the Tule Lake Refuge is mostly open waters and agricultural croplands, dominated by facilities associated with "reclamation," including four sump areas.

87.    Approximately 17,000 acres of Tule Lake Refuge are leased for commercial agriculture under the Public Lease Lands program.  An additional 2,500 acres are farmed under permits in cooperation with the Service.  Tule Lake Refuge provides habitat for the endangered Lost River and shortnose suckers and is a significant staging area for migrating waterfowl during spring and fall migration.

**Clear Lake Refuge**

88.    President William Taft established the Clear Lake National Wildlife Refuge through Executive Order 1332 on April 1l, 1911 "as a preserve and breeding ground for native birds."  Clear Lake Refuge is located in northeastern California and contains the Clear Lake Reservoir, approximately 20,000 acres of open water, surrounded by over 26,000 acres of upland bunchgrass, low sagebrush, and juniper habitat.

89.    The Clear Lake Refuge has the same four purposes under the Kuchel Act as the Upper Klamath Refuge, further underscoring the importance of this ecosystem for waterfowl and wildlife conservation.  *See supra* ¶ 39.

90.    Clear Lake Refuge provides important nesting sites for American white pelicans, double-crested cormorants and other colonial nesting birds.  The Clear Lake Refuge includes

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

upland habitat for pronghorn antelope, mule deer, and sage grouse.  The purpose of "wildlife conservation" extends to these terrestrial species living within the Clear Lake Refuge.

**Bear Valley Refuge**

91.    Bear Valley National Wildlife Refuge is a 4,200-acre refuge located in southern Oregon and consists primarily of old growth ponderosa pine, incense cedar, and white Douglas fir.  The Bear Valley Refuge represents one of the few areas in the Klamath Basin containing suitable roost trees, which are in close proximity to bald eagle food sources.

92.    Because of this important ecosystem, the Bear Valley Refuge was established in 1978 "as a communal winter roost for bald eagles . . . ."  Thus, a primary purpose of the Refuge is "preservation of remaining forested areas" for bald eagles.

93.    The Service has identified the following six purposes for the Bear Valley Refuge: (1) "to conserve (A) fish or wildlife which are listed as endangered species or threatened species . . . or (B) plants" under the ESA; (2) "for the development, advancement, management, conservation, and protection of fish and wildlife resources" pursuant to the Fish and Wildlife Act of 1956; (3) "for the benefit of the United States Fish and Wildlife Service, in performing its activities and service . . . subject to the terms of any restrictive or affirmative covenant, or condition of servitude" pursuant to the Fish and Wildlife Act of 1956; (4) "for: . . .  incidental fish and wildlife-oriented recreational development, . . . the protection of natural resources, [and]. . . the conservation of endangered species or threatened species" pursuant to the Refuge Recreation Act; (5) for the "accept[ance] and use [of] real . . . property pursuant to the Refuge Recreation Act;" and (6) for the "conservation, management, and restoration of the fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations of Americans" pursuant to the Refuge Administration Act.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

**Refuge Water Rights**

94.     The Lower Klamath and Tule Lake Refuges are located within the Klamath
Reclamation Project ("Klamath Project" or "Project") and are dependent on Project facilities for
delivery of refuge water supplies.  The Klamath Project was authorized for irrigation, domestic,
and power purposes.  Lower Klamath and Tule Lake Refuges receive water supply from Project
diversions and return flows to irrigate wetland vegetation and agricultural crops.

95.     Based on a 1995 Memorandum from the Pacific Southwest Regional Solicitor,
Klamath Project water is managed with first priority to compliance with the ESA, followed by
tribal trust resources, and then, to the extent water is available, to meet the obligations under
contracts with Klamath Project water users, including irrigated lands on the Refuges.  Lastly,
water is supplied to meet the Refuges' federal reserved water rights, which have junior priority.

96.     The Klamath Basin Water Rights Adjudication ("Adjudication") is a proceeding
for determining the validity, priority, quantity, and other components of water rights to surface
water in the upper Klamath Basin, pursuant to Oregon law.  In 1997, the Service filed two sets of
claims in the adjudication, including irrigation claims for a 1905 priority date and federal
reserved claims based on the dates in which the Refuges were established.

97.     In order to provide a complete matrix of permanent wetlands, seasonal wetlands,
uplands, and agricultural habitats, Lower Klamath Refuge requires a minimum of 95,000 acre-
feet of water per year, not including the Area K leaselands, which require an additional 19,000
acre-feet per year.

98.     In the Final Order of Determination issued by the Oregon Water Resources
Department in March 2013, the Service received Klamath Project water rights with a 1905
priority date for irrigation uses for the leased and cooperative agricultural lands on both refuges,

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

with 35,000 acre-feet for Lower Klamath Refuge and nearly 50,000 acre-feet for Tule Lake

Refuge.  The Service's 1905 irrigation rights are Klamath Project water rights.  The Service's

1905 irrigation rights have a limited period of use from March 1 to October 31 for Lower

Klamath Refuge and February 15 to November 15 for Tule Lake Refuge.

99.    Through the Adjudication, the Service also received federal reserved rights with a

priority date of 1925 for Lower Klamath Refuge for nearly 109,000 acre-feet, and 1928 and 1936

priority dates for Tule Lake Refuge for nearly 98,000 acre-feet.  The Service's federal reserved

water rights are not Klamath Project water rights.  The Service's federal reserved water rights

have a year-round period of use.

100.    In the Final Order of Determination for the Adjudication, the State of Oregon

asserted that the Service may not use its 1905 irrigation right for "irrigation for or consistent with

Refuge purposes," because, while the use is consistent with the state's definition of "irrigation,"

the State of Oregon asserts that the use is not consistent with the meaning of the term

"reclamation" and the text of the Reclamation Act.  The United States is challenging the State's

legal opinions on the meaning of "reclamation" and "irrigation" in the current stage of the

Adjudication before the Klamath County Circuit Court.

101.    Although the Adjudication established the relative priority of all water rights

within the Basin, it did not determine the priority of Klamath Project water users relative to each

other, commonly referred to as the "within-Project priority."  The within-Project priority is an

issue for determination by the Secretary of the Interior.  If Klamath Project water supply is

limited, water is distributed to Klamath Project users according to the within-Project priority.

102.    The Tule Lake Refuge irrigated lands have an A, or first priority, to Project water.

The within-Project priority for Lower Klamath Refuge irrigated lands has never been

conclusively determined.  The Bureau of Reclamation has assumed Lower Klamath Refuge to be last in priority.  Under the Bureau of Reclamation's historical criteria for determining within-Project priority, Lower Klamath Refuge is entitled to an A priority within the Klamath Project, just as Tule Lake Refuge has an A priority.

103.    A number of factors have led to a decrease in water supplies to the Refuges in recent years including, but not limited to, ESA requirements, persistent drought, and unresolved issues regarding Refuge water rights.

104.    In March 2013, the Service and the National Marine Fisheries Service issued a joint Biological Opinion ("2013 BiOp") on the "*Effects of Proposed Klamath Project Operations from May 31, 2013 through March 31, 2023, on Five Federally Listed Threatened and Endangered Species.*"  The BiOp imposes seasonal limitations on how much water is available for diversion within the Klamath Project.  The 2013 BiOp expires in 2023.

105.    In recent drought years, including 2010, 2013, 2014, and 2015, Lower Klamath Refuge has seen declines in both return flows and direct Klamath Project diversions.  Water deliveries to the Lower Klamath Refuge have been reduced from an annual average of 107,000 acre-feet from 1962 to 2009 to an annual average of 32,000 acre-feet from 2010 to 2014.  Lower Klamath Refuge received only 14,000 acre-feet of water in 2014 and approximately 19,000 acre-feet in 2015.

106.    Shortages in water delivery to Lower Klamath Refuge are related, in part, to the unresolved within-Project priority for Lower Klamath Refuge.

**Procedural History of the Plan**

107.    In 2010, the Service announced its intent to prepare a Comprehensive Conservation Plan for five of the six refuges.  Four years later, and over two years past the

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

statutory deadline, the Service had yet to release a draft plan, so Audubon Society of Portland,

Oregon Wild, and WaterWatch of Oregon brought suit against the Service to compel it to

develop and implement a plan pursuant to the Refuge Act and consistent with all other applicable

laws.

108.    After the Service stipulated to liability for its failure to meet the statutory deadline

for completion of a CCP, the parties filed competing motions regarding an appropriate timeline

for its completion.  The court granted Plaintiffs' motion, setting the deadline for approval of a

final Plan for August 1, 2016.

109.    On May 6, 2016, the Service released the draft Plan for the Upper Klamath,

Lower Klamath, Tule Lake, Clear Lake, and Bear Valley Refuges and provided a 45-day public

comment period.  81 Fed. Reg. 27468.  Following the release of the draft Plan, the Service

moved for an extension of the court ordered deadline for the Final Plan.  Plaintiffs stipulated to

extension of the deadline and requested that the public comment period also be extended to allow

90 days for public comment.  The Service opposed Plaintiffs' requested extension of the

comment period.  On June 6, 2016, the court granted the Service's motion in part and extended

the final deadline for the Record of Decision on the Final Plan to January 17, 2017.  *Audubon*

*Soc'y of Portland, et al. v. Jewell, et al.*, Case No. 1:14-cv-00675-CL (June 6, 2016 D. Or.) (ECF

No. 46).  The court also ordered the Service to extend the public comment period on the draft

Plan to 90 days because "a robust public comment period is at the heart of NEPA, which

encourages public engagement and dialogue."  *Audubon Soc'y of Portland*, at *2.

110.    The comment period for the draft Plan closed on August 4, 2015.  The Service

received nearly 800 comments on the draft Plan.  The Service released the final Plan on

December 8, 2016, with a notice of availability published in the Federal Register the following

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

day.  Final Comprehensive Conservation Plan/Environmental Impact Statement, 81 Fed.

Reg. 89138 (Dec. 9, 2016).

111.    The Service signed the Record of Decision for the Plan on January 17, 2017.

**Final Plan**

112.    The Plan is a programmatic document intended to analyze proposed management

actions on a conceptual level for a 15-year planning period consistent with refuge purposes;

refuge goals and objectives; and applicable laws, regulations, and policies.  The Plan must

describe desired future conditions of each of the refuges, providing guidance for the management

direction to achieve the purposes of each of the refuges based on sound principles of fish and

wildlife conservation and legal mandates.

<div align="center">The Kuchel Act</div>

113.    Prior to developing alternatives for the Plan, the Service was required to articulate

its interpretation of the Kuchel Act, specifically, the Kuchel Act's directive that "[t]he Secretary

shall, consistent with proper waterfowl management, continue the present pattern of leasing"

within Lower Klamath and Tule Lake Refuges.  16 U.S.C. § 695n.

114.    The Service acknowledged that it must interpret the Kuchel Act in an integrated

manner with the Refuge Act and the Plan.  The Service explained that its interpretations were

"seen as key to developing management alternatives during the CCP process as well as a

framework from which to conduct future management planning."  Plan 4-3.  The Service's

interpretation of the Kuchel Act informs how the Service created, shaped, and analyzed

alternatives for the Plan.  The Service's interpretation of the Kuchel Act is included as

Appendix M to the Plan.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

115.    The Plan states that "[a]lthough 'proper waterfowl management' is the major purpose of the Kuchel Act, additional secondary refuge purposes related to agriculture are derived from the Kuchel Act."  Plan at 4-3.  The Service describes the Kuchel Act as a compromise between competing agricultural and wildlife preservation interests, finding that "it would both retain refuge lands in Federal ownership with the major purpose of waterfowl management and would still maintain agricultural leasing consistent with the irrigation purposes of the Klamath Project . . . ."  Plan, at M-14.  The Service describes the Kuchel Act as a "win-win solution" which preserved the agricultural leasing program while providing for waterfowl and other wildlife.  Plan, at M-14.

116.    The Service's interpretation of the Kuchel Act includes a discussion of what constitutes "proper waterfowl management."  Based on a review of scientific literature, expert opinion, and the North American Waterfowl Management Plan, the Service defined proper waterfowl management as: "providing habitats sufficient to support waterfowl population objectives throughout the annual cycle while promoting the highest possible natural biological diversity of refuge habitats.  A sufficient quantity and diversity of foraging resources should be provided that will meet the energy requirements and nutritional demands of all waterfowl species.  Where feasible, natural foods should be given priority over agricultural crops."  Plan at M-29.

117.    The Service discussed the Kuchel Act's directive to continue the "present pattern of leasing" as being flexible in terms of cropping patterns, lease contract stipulations and management practices in order to provide sufficient food resources for waterfowl.  However, Appendix M of the Plan does not discuss whether the Kuchel Act allows, or requires, reductions in the "present pattern of leasing" in terms of total acreage where the associated demand for

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

limited water resources, use of pesticides, and lack of diverse habitat is no longer consistent with proper waterfowl management.

118.    The Service concluded that, in order to continue the "present pattern of leasing" in a manner consistent with proper waterfowl management, "[t]he overall program must provide sufficient food resources to support population objectives for waterfowl (dabbling ducks and geese) during the spring and fall migration.  In addition, post-harvest farming practices and other practices must be implemented that will increase the attractiveness of the fields for foraging waterfowl and disperse waterfowl use as widely in the leased lands as possible."  Plan at M-30. This conclusion formed the basis for the Service's bioenergetics approach to waterfowl management on the Refuges and the alternatives analyzed in the Plan.

<u>Bioenergetics Approach to Management</u>

119.    The Plan includes a report titled "A Bioenergetic Approach to Conservation Planning for Waterfowl at Lower Klamath and Tule Lake National Wildlife Refuge" ("Bioenergetic Report").  Plan, Appendix N.  The Bioenergetic Report was developed in 2008 and is an unpublished report that has not been subject to peer review.  The Report focuses exclusively on certain waterfowl, neglecting other waterfowl and waterbirds.  In the Plan, the Service relied on the Bioenergetic Report as the foundation for its management direction, population objectives, and habitat management alternatives for waterfowl and waterbirds alike.

120.    The Bioenergetic Report is based on the assumption that food availability is the limiting factor for waterfowl populations in the Klamath Basin Complex.  The Report focuses on a narrow subset of waterfowl guilds that are more able to rely on food found in agricultural fields, including a subset of diving ducks (canvasbacks, redheads, and ring-necks), dabbling ducks, swans, geese, and coots.  The Report uses data from 1970–1979 to establish population

objectives for dabbling ducks, diving ducks, and coots and data from 1990–1999 for goose and swan population objectives.

121.    The Bioenergetic Report does not include ruddy ducks, scaup, or buffleheads among the diving duck guild that is modeled or included in population objectives.  These three species represent over half the diving ducks using the Lower Klamath and Tule Lake Refuges. These species of diving ducks have diverse diets that include wetland foods, benthic crustaceans and mollusks that were not included in estimates of food and habitat availability.  The Report's population goals do not include these habitat needs and thus overestimates the ability of the refuge habitats to support a diversity of waterfowl species that depend on the Refuges.

122.    The Report does not include population objectives or adequate baseline data from the 1950s and 1960s leading up to the passage of the Kuchel Act when waterfowl populations in the Refuges were much more robust.  At that time, autumn staging waterfowl numbers were much higher at both Lower Klamath and Tule Lake Refuge.

123.    The model simulations analyzed in the Bioenergetic Report made no assumptions regarding the availability of water on the Refuges.

124.    The data and conclusions in the Bioenergetic Report are outdated and do not support the conclusions made in the Plan.  In the last decade, water deliveries and waterfowl populations have been heavily impacted by water shortages and climatic changes that are likely to persist into the future.

125.    Recent data indicates that adequate water may be as important as or more important than food as a limiting factor for achieving waterfowl and waterbird population objectives on the Refuges.  Adequate water supplies are necessary to providing food and habitat; without water to provide natural habitats the Service is not achieving the highest possible natural

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

biological diversity of refuge habitats and resources to meet the energy requirements and nutritional demands of all waterfowl species.

<div align="center">Water Delivery Scenarios</div>

126.    Ensuring an adequate supply of water for refuge wetlands is essential to achieving refuge purposes.  The Service concludes that it requires a total of 114,000 acre-feet of water deliveries in order to provide for the full range of habitat on Lower Klamath Refuge.

127.    The Service based its analysis of water management alternatives for Lower Klamath Refuge and, to some extent, Tule Lake Refuge on two water allocation scenarios to represent potential water deliveries over the 15-year planning period for the Plan.

128.    The first water delivery scenario is pursuant to the 2013 BiOp.  This represents how water is currently being allocated.  The model for deliveries under the 2013 BiOp for the life of the Plan is based on simulated deliveries to Lower Klamath Refuge from 1981 through 2011 if the 2013 BiOp had been in place during that time.  The 2013 BiOp expires by its own terms in 2023, less than half way through the 15-year life of the Plan.

129.    The second water delivery scenario represents estimated water deliveries pursuant to the Klamath Basin Restoration Agreement ("KBRA") or similar agreement.  The KBRA was an agreement between Klamath River Basin stakeholders, including the United States; state, local, and tribal governments; irrigation districts and other Klamath Project water users; and non-governmental organizations.  One goal of the KBRA was to establish water supplies for agricultural uses and the Refuges.  Oregon Senator Ron Wyden introduced the KBRA as part of a bill to the U.S. Senate in May 2014.  The KBRA and associated legislation failed to pass Congress for several years and eventually expired on January 1, 2016.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

130.    The Service produced a range of simulated monthly water delivery volumes for both the 2013 BiOp and KBRA models including three water year scenarios to represent dry, median, and wet water years.

131.    Under the 2013 BiOp, the Service's 1905 irrigation water rights would be used to flood agricultural leaselands and cooperatively farmed units, while the Service's federal reserved rights would be used to flood seasonal and permanent wetland units and to pre-irrigate outside of the irrigation season.  The Plan asserts that under the KBRA, refuge water deliveries under the 1905 water right could be used for any wetland or agricultural habitat management purpose.  The Plan does not explain this conclusion of reconcile it with the State of Oregon's limitation on the definition of "irrigation" for Klamath Project water in the May 2013 Final Order of Determination in the Adjudication.

132.    Impacts of the Plan's water delivery scenarios are not addressed in relation to predicted future climatic trends in the Klamath Basin and the Great Basin Ecoregion.  Climate change predictions for the Great Basin Ecoregion, which includes the Klamath Basin Refuges, project that impacts from climate change on thermal conditions will be warmer winter temperatures, earlier warming in the spring, later cooling in the fall, and increased summer temperatures.  Recent climate trends in the Klamath Basin have seen increased winter temperatures and decreases in winter precipitation, resulting in decreases in spring snowpack and decreased streamflow in the summer and fall.

133.    For Lower Klamath Refuge, the Plan states that, in all but the wettest years under the 2013 BiOp, water deliveries would fall well short of full demand to meet habitat needs. Annual water deliveries under the 2013 BiOp would range from 18% of full demand in a dry water year to 84% in a wet water year.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 35

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

134.    Under the KBRA, the Plan asserts that, Lower Klamath Refuge deliveries would range from 73% of full demand in a dry water year to 95% in a wet water year.

135.    For Tule Lake Refuge, water shortages as a result of reduced agricultural return flows would occur more frequently under the 2013 BiOp than under the KBRA.  Under either scenario, returns flows from upstream agricultural use would continue as the major source of refuge water.

136.    The Service did not consider any other water delivery scenarios or alternatives for securing water supplies necessary for refuge purposes during the Plan's 15-year planning period. The Plan did not consider or include a water delivery scenario or alternative that takes into account the expiration of the 2013 BiOp in 2023.  The Plan did not consider an alternative that did not include the hypothetical water delivery scenario of the expired KBRA.

<u>Waterfowl/Waterbird Conservation</u>

137.    As discussed above, breeding and molting waterfowl have unique habitat and nutritional needs, and are particularly dependent on wetlands.  The Plan continues with business as usual and does not meet the needs of or establish adequate population or habitat targets for breeding or molting waterfowl across the Klamath Basin Complex in light of persistent drought, changing climatic conditions and the direct, indirect and cumulative impact of past, present and reasonably foreseeable future activities in the five Refuges.

138.    In setting habitat goals, the Plan only addresses historic average numbers of breeding pairs for five duck species for just the Lower Klamath and Tule Lake Refuges.  Plan at F-2–3.  These numbers though, do not disclose or address population or habitat needs and objectives for critical life stages for ducks, including the molting and breeding stages.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

139.     The Plan does not discuss the specific needs of numerous other waterfowl and waterbirds, such as pelicans, grebes, shorebirds, and rails, that utilize and rely on the Klamath Basin Complex or other refuges within the complex.

140.     Unlike waterfowl, some non-game waterbirds, are largely dependent on wetlands for their food, nesting, and shelter, and are particularly sensitive to water level changes.  For example, during breeding season, Yellow Rails only use habitat with very shallow water of particular depths amid particular vegetation structure.  Other birds are likewise affected during specific life stages, requiring certain water levels.  Thus, healthy populations of different water birds require the availability of a variety of wetlands throughout the Klamath Basin Complex.

141.     Despite over 50 species of diverse waterbirds using the Klamath Basin Complex, the Plan provides management targets and population objectives for seven non-game waterbirds and shorebirds, failing to explain how meeting the needs of these few species is a surrogate for meeting the needs of all waterbirds and shorebirds using the Klamath Basin Complex.

142.     The Plan does not address the increasing outbreaks of avian diseases, such as cholera and botulism.  In recent years, the Lower Klamath Refuge wetland habitat has dried up in the late summer or early fall.  Inadequate water supplies are the result of a significant reduction in water deliveries, as well as consecutive drought years and climatic changes.

143.     Experts predict that the Klamath Basin will only get drier in the coming years and that climatic changes will worsen conditions in the Klamath Basin Complex.

144.     Because of the lack of wetlands in the Lower Klamath Refuge, many birds crowd around the Tule Lake Refuge sumps.  The crowding has caused severe disease outbreaks and underscored a link between reduced water deliveries to the Lower Klamath Refuge and a higher than average disease mortality at the nearby Tule Lake Refuge.  The available science suggests

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

that these outbreaks will increase with continued water shortages and wetland declines, increased environmental contaminants, and the expected climatic changes.

145.    The Plan ignores important aspects of the problem facing the Service in meeting the major purposes of the Refuge Act and the Kuchel Act.  The Plan does not include any Best Management Practices to limit avian disease outbreak, nor does it consider an alternative that would ensure that sufficient water is delivered to the Lower Klamath Refuge or other refuges. Instead of addressing these known problems, the Plan focuses entirely on reacting to them by patrolling wetland areas historically associated with outbreaks to try and detect outbreaks and react to them by removing sick and dead birds from the wetlands.

<div align="center">Compatibility Determinations</div>

146.    The Plan includes Compatibility Determinations ("CDs") for the various uses of each refuge, including the leaseland and cooperative agriculture programs on Lower Klamath and Tule Lake Refuges.  Approximately 12 percent of Lower Klamath Refuge and 50 percent of Tule Lake Refuge are included in the leaseland agriculture program.  An additional 10 percent of Lower Klamath Refuge and 17 percent of Tule Lake Refuge are managed under the cooperative farming program.

147.    The Service has delegated administration of the leaseland agriculture program on Lower Klamath and Tule Lake Refuge to the Bureau of Reclamation.  The Bureau leases the lands to private individuals and companies on a competitive bid basis for commercial crop production.  Leases are for five years with an annual option to renew.  Primary crops include barley, oats, wheat, onions, potatoes, and alfalfa; no row crops are grown on Lower Klamath Refuge.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

148. The Plan concludes that both the leaseland and cooperative agriculture programs on Lower Klamath and Tule Lake Refuges are compatible with certain stipulations.

149. Regarding leaseland agriculture, the CDs evaluate anticipated impacts to soil resources, water quality, chemical pest control, crop types and habitat management, protected or special concern species, and public use. The CDs for leaseland agriculture do not include any discussion of the program's impacts to water quantity, despite a recent admission from Service staff that "the current problem is that water that we have available under water rights goes to leased land farming with some but limited wildlife benefit, while main purpose of refuge, waterfowl, is unmet." Service, Jan. 20, 2015 Minutes, Klamath Complex Water Rights Meeting at 3.

150. In the Lower Klamath Leaseland CD, the Service acknowledges that there is a chronic shortage of water in the Refuge and details declining water deliveries to the Refuge habitat lands since 2010. The CD does not include a comparison discussion of the amount of water delivered to Lower Klamath Refuge's Area K leaselands during that same time period.

151. In the Tule Lake Leaseland CD, the Service only includes discussion of water deliveries to the leaselands and excludes any discussion of water deliveries for wetland habitat outside the leaselands.

152. In a prior 1999 Compatibility Determination for the agricultural leaseland program on Lower Klamath and Tule Lake Refuges, the Service concluded that the leaseland program was consistent with refuge purposes, "only if sufficient water is available to maintain wetlands first, followed secondarily by water for use on agricultural habitats." The 1999 CD also included stipulations required to ensure compatibility and the Service stated that if those

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

stipulations could not be met, "then elimination or modification of the leasing program may be necessary."

153.    The Plan fails to disclose or address how using the Service's water rights to first deliver water to the leaselands and leaving too little for the refuge wetland habitats meets the major purposes of the Refuge Act and Kuchel Act.  The Service fails to explain or justify how an approach that prevents the major purpose from being met is "consistent" or "compatible" with proper waterfowl management.

154.    The CD for the leaseland agriculture program on Lower Klamath Refuge included in the draft Plan relied on "walking wetlands"—a program for rotating wetlands on a 1- to 3-year basis with agricultural crops —as a stipulation necessary to ensure compatibility.  "Walking wetlands" are used to mitigate impacts from agricultural uses by suppressing soil pathogens and weeds and enhancing soil fertility and to make agricultural fields more attractive to migrating waterfowl.  The CD in the draft plan relied on "walking wetlands" to implement the stipulation that "[a]ll leased farm lands must be managed such that all agricultural fields are within on mile of wetland habitat."

155.    Plaintiffs' comments on the draft Plan raised issue with this stipulation, noting that the walking wetlands program has never been implemented on Lower Klamath Refuge.  As a result the leaseland CD appeared to be relying on off-refuge compensatory mitigation to ensure compatibility of the leaseland program on the Refuge, against the Service's compatibility policy.

156.    In response to comments, the Service acknowledged that walking wetlands have never been used on Lower Klamath Refuge and claimed that walking wetlands "would not be included on the refuge in the future."  Plan at U-121.  The Service removed the stipulation from the Lower Klamath leaseland compatibility determination in the final Plan.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 40

157.    The Lower Klamath leaseland CD in the final Plan includes a new stipulation necessary to ensure compatibility that was not included in the draft Plan.  Stipulation 2 states, "[p]rovide flooded wetlands and flood fallow agricultural fields to ensure a sufficient balance of foraging and resting habitat for waterfowl and other waterbirds, consistent with water rights, supply, and delivery priority."  Plan at G-154.

158.    The Service used the terms "walking wetlands" and "flood fallow" interchangeably in both the draft and final Plan.

159.    In the leaseland program CDs, the Service discloses the need for the agricultural uses to be consistent with proper waterfowl management regarding food resources to waterfowl. Plan at G-150, G-350.  The Service acknowledges that agricultural lands do not provide habitat for some waterfowl species and do not provide a balanced diet for many waterfowl and waterbird species.  The Service then concludes that agricultural lands provide carbohydrates to migrating dabbling ducks and geese, and based on this limited finding, the Service erroneously concludes that continued agricultural leasing of the Refuges is integral to achieving population objectives for waterfowl.  Plan at G-157, G-357.

160.    In the Tule Lake Leaseland CD, the Service admits that row crops such as horseradish and onions "have no food value for waterfowl."  The Tule Lake Leaseland CD authorizes continued planting of row crops in order to maximize lease revenues.

161.    Agricultural lands do not provide habitat or a balanced diet.  The Service needed to fully analyze and discuss the impacts of failing to provide necessary food, particularly in light of the lack of water on refuge lands.

162.    In addition to water shortages, the CDs discuss water quality impacts from the agricultural leaseland program.  Both the CDs for Lower Klamath and Tule Lake Leaselands

note that "[p]oor water quality on the Refuges is affected by water quality in Upper Klamath Lake (primary source) and the Refuges location at the terminus of the Klamath Project."  Plan at G-150, G-348–49.  The CDs also concede that "[l]ease land farming may contribute to poor water quality at certain times of year with runoff that may contain elevated concentrations of nutrients."  Plan at G-149, G-349.

163.    Poor water quality interferes with and detracts from waterfowl and waterbird use and management.  The CDs do not include any concrete stipulations to address water quality impacts of the leaseland program in order to make it compatible with refuge purposes.

164.    The CDs for the cooperative farming program suffer from the same deficiencies as the leaseland CDs.  The Service failed to discuss and analyze impacts of the cooperative farming program to water quantity and soil resources.  The Lower Klamath cooperative farming CD includes similar inconsistent statements regarding the use of walking wetlands of flood fallow.  Certain stipulations that were deemed necessary to ensure compatibility of the leaseland agricultural program were inexplicably omitted from the cooperative farming program CDs.

165.    Continued agricultural activities at current levels, in light of increasing drought and climatic changes, will further harm waterfowl, waterbirds, and other wildlife and will materially interfere with and detract from the fulfillment of the National Wildlife Refuge System mission and refuge purposes.  In reaching its compatibility determination, the Service failed to consider the full range of anticipated direct, indirect and cumulative impacts of the continued leasing of the Refuges for agricultural uses at current levels.

<u>Alternatives</u>

166.    The Service developed different alternatives for each of the five refuges.  In the draft and final Plan, the Service considered a "no action" alternative for each refuge.  The "no

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

action" alternative provided a flawed baseline that relied on expired legislation and agreements, particularly the Klamath Basin Restoration Agreement, and a water delivery regime—under the 2013 BiOp—that is certain to expire less than half way through the 15-year life of the Plan.

167.    The Service considered varying amounts of action alternatives for each refuge: for the Lower Klamath Refuge, the Service considered three action alternatives; for the Clear Lake Refuge, the Service considered one action alternative; for the Tule Lake Refuge, the Service considered two action alternatives; for the Upper Klamath Refuge, the Service considered one action alternative; and for the Bear Valley Refuge, the Service considered one action alternative.

168.    In their comments on the draft Plan, Plaintiffs proposed multiple alternatives for each refuge.  Plaintiffs' proposed alternatives discussion first focused on the Service's faulty assumptions in its alternatives analysis, namely an incorrect analysis of refuge water rights and the Reclamation's mischaracterization of the status of the Service's federal reserved water rights. Plaintiffs subsequently proposed multiple viable alternatives, focusing largely on an increase in the minimum water provided annually to each refuge, and including options for altering water rights and options for reducing or phasing out the agricultural lease program in order to achieve the main purposes of the Refuge Act and Kuchel Act.  Plaintiffs presented viable alternatives for securing wetland habitat and food resources, including restoring viable water input into Lower Klamath Refuge to restore wetland habitats for birds and other wildlife, restricting grazing during breeding season, updating management plans throughout the refuges, and reducing harmful herbicide treatments.

169.    The alternatives in the final Plan remained virtually identical to those presented in the draft Plan.  In the final Plan, the Service designated a "preferred alternative" which was not disclosed in the draft Plan.  According to the Service, it did not identify a preferred alternative in

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

the draft Plan "because the Service based much of its decision-making not only on impact analysis and the degree and way alternatives meet stated goals, but also how the interested and affected public responded."  Plan at 4-1.

170.    Despite claiming to value public input, the Service did not substantively alter the alternatives analysis between the draft and final Plan, nor did it add any alternatives for "detailed analysis" for the final Plan.  The Service did not add any alternatives to its "management actions considered but eliminated from detailed alternatives analyses" for the final Plan.

<u>Impacts on Water Quality</u>

171.    The Plan acknowledges that the Lost River is listed as impaired and that current management is resulting in violations of water quality standards.  Plan at 6-19.  The Plan specifically admits that "[w]aterbodies throughout the entire area are listed as impaired for nutrients, low dissolved oxygen, and high pH . . . ."  Plan at 6-19.

172.    The Plan acknowledges that sources causing these violations include agriculture and that a main "[c]ontribution[] from Lower Klamath Refuge include[s] agricultural runoff . . . ."  Plan at 6-19.  Agricultural leaselands within Tule Lake and Lower Klamath Refuges are a major component of agricultural nutrient loading in the system leading to the Klamath Straits Drain.

173.    Water quality data for the Klamath Straits Drain shows high levels of ammonia, nitrite and nitrate, and total phosphorus indicating seriously impaired water quality.  The Klamath Straits Drain flows into the Klamath River.

174.    The Lost River TMDL assigns a required 50% nutrient load reduction to agricultural irrigation loading in the Lost River Basin.  This means that agricultural drainage

output of nutrients must be cut in half to comply with the TMDL and thereby achieve the desired and mandatory water quality standards.

175.    The Plan does not address or resolve the Service's obligation under the CWA to comply with the water quality standards.

176.    The Service defers meeting its obligation and states that "long-term regulatory processes related to TMDLs" are "currently being reconsidered and may result in overall reductions in pollutant loads."  Plan 6-19.  The Service states that these discussions are "complex" and "may take substantial time to resolve," and the Plan concludes that "specific timelines and specific water quality improvements have not been formally defined at this stage, including the prescriptions for the Service to undertake on the refuge, but are part of a longer-term strategy to improve water quality."  Plan at 6-19–6-20.

177.    The Service's failure to address the TMDLs for the Lost River and meet its obligations under the CWA is common to all alternatives for the Lower Klamath and Tule Lake Refuges.

## FIRST CLAIM FOR RELIEF:
### (NEPA and APA Compliance)

178.    Plaintiffs re-allege and incorporate all preceding paragraphs into each of the counts set forth below.

## Count One—Range of Alternatives

179.    Pursuant to NEPA, an agency "shall to the fullest extent possible" use the NEPA process "to identify and assess the reasonable alternatives to proposed actions that will minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. § 1500.2(e).  Reasonable alternatives include those that substantially meet the agency's purpose and need.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

180.     The Plan included a "no action" alternative that included a flawed baseline, and varying amounts of relatively similar action alternatives that maintained existing agricultural leases for each refuge.

181.     Some refuges had only one action alternative.  For example, the Plan's discussion of the Bear Valley Refuge included one action alternative that was mostly identical to the no action alternative.  This alternative did not adequately address wildlife concerns, such as limiting permissible activities that could harm species and defining what actions the Service would take in response to species' population declines.

182.     The Plan repeatedly emphasized the primary purposes of the Kuchel Act being waterfowl management.  The Plan discussed the purposes of the individual refuges, which focus on protection of waterfowl and other wildlife.

183.     Despite the direction in the Kuchel Act and the Refuge Act, none of the Plan's alternatives achieve the major purpose of conserving waterfowl and other wildlife.

184.     Given the direction in the governing laws, a reasonable range of alternatives includes consideration of modifying or reducing existing agricultural leases to meet the major purposes of the Kuchel Act and Refuge Act to provide for waterfowl.  Similarly, as water availability is the true limiting factor for meeting waterfowl management and population objectives, as well as objectives for wildlife, waterbirds, and shorebirds, the Plan needed to consider an alternative for changes in the distribution of Refuge water rights, including securing additional water rights, in order to achieve refuge purposes.  The Service did not analyze reasonable alternatives that would have met the purpose and need, and these objectives.

185.     The Service failed to consider reasonable alternatives to the problems plaguing the Refuges by not analyzing and considering supplying at least the minimum amount of water

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

necessary for each refuge, possible changes to water rights, reduction or elimination of the agricultural lease program, reduction in harmful herbicide treatments, and updated management plans.

186.    Defendants' failure to consider a reasonable range of alternatives is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

**Count Two—Direct, Indirect, and Cumulative Impacts**

187.    Pursuant to NEPA, an agency must discuss and analyze an action's direct, indirect, and cumulative impacts, when added to other past, present, and reasonably foreseeable future actions.  40 C.F.R. § 1508.7.

188.    Under current conditions, the agricultural leasing program on Lower Klamath and Tule Lake Refuges receives the majority of limited water supplies available to refuge lands while wetland habitats are left dry.  The Plan failed to disclose the impacts from the leaseland program on water availability for wetland habitat and refuge purposes.

189.    Agricultural runoff from leaselands on the refuges will affect conditions in the Klamath River, including habitat for species listed under the Endangered Species Act.  The Service failed to disclose and analyze the direct, indirect and cumulative effects on water quality in the Klamath River and species within, relying on a cursory statement that current agricultural practices *may* reduce nutrient loads to the Klamath River.

190.    The Plan fails to disclose the impacts of water quantity, lack of diverse wetland habitat, and water quality on waterfowl, waterbirds, and other wildlife that depend on the Refuges.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

191.    Defendants' failure to disclose and analyze all direct, indirect, and cumulative impacts in the final Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF:**
**(Violations of the Kuchel Act and the APA)**

192.    Plaintiffs re-allege and incorporate all preceding paragraphs into the claim set forth below.

193.    The purpose of the Kuchel Act—evident both in the statute's text and in the legislative history—is wildlife conservation.  The Kuchel Act requires that all lands within the Upper Klamath, Lower Klamath, Tule Lake, and Clear Lake Refuges "be administered for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith."  16 U.S.C. § 695*l*.

194.    Agricultural leasing is permitted on the refuges only to the extent that it is consistent with proper waterfowl management.

195.    The Plan's focus on the Bioenergetic Report as the basis for population objectives and management alternatives fails to achieve proper waterfowl management and wildlife conservation, because that report only addresses a specific subset of waterfowl and excludes many waterfowl, waterbirds, and shorebirds.  The Plan and Bioenergetic Report do not include population or habitat data that reflects conditions at the time the Kuchel Act was enacted.

196.    The Plan ignores water shortages as the limiting factor for waterfowl populations and authorizes continuation of the "present pattern of leasing" on Lower Klamath and Tule Lake Refuges despite inadequate water supplies to provide for necessary wetland habitats while also providing water for agricultural crop irrigation.  The Plan does not consider how persistent drought and changing climatic conditions present changed circumstances that require the Service

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 48

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

to consider a reduction in the "present pattern of leasing" to ensure that the Service meets the major purpose of the Kuchel Act.

197.    The Plan authorizes continued planting of row crops on Tule Lake Refuge leaselands despite the Service's admission that row crops "have no food value for waterfowl."

198.    The Plan fails to fully address avian disease outbreaks and provides no solutions or proposals to minimize outbreaks within the Refuges.

199.    The Plan neglects habitat needs and population objectives for non-game waterbirds that are abundant on the Refuges.

200.    The Plan was developed and analyzed based on the Service's flawed interpretation of the Kuchel Act.  This interpretation has serious impacts on the analysis throughout the Plan.

201.    Defendants' interpretation of the Kuchel Act in the final Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with Kuchel Act, in violation of 5 U.S.C. § 706(2)(A).

202.    As a result, the Plan and the ROD are contrary to the mandates of the Kuchel Act, in violation of 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF:
### (Violations of the Refuge Act and the APA)

203.    Plaintiffs re-allege and incorporate all preceding paragraphs into each of the counts set forth below.

## Count One—Compatibility Determinations

204.    Under the Refuge Act, the Secretary "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use . . . ."  16 U.S.C. § 668dd(d)(3)(A)(i).  A "compatible

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 49

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

use" is a use that "will not materially interfere with or detract from the fulfillment of the mission or the System or the purposes of the refuge."  16 U.S.C. § 668ee(1).

205.    The Service made several Compatibility Determinations for uses that detract from or materially interfere with the mission of the Refuge System and the purposes of the Klamath Basin Complex Refuges.  These include compatibility determinations for leaseland agriculture and cooperative farming programs on Lower Klamath and Tule Lake Refuges.  These uses have had and continue to have increasingly significant impacts on water quality and quantity, food supply, habitat, and spread of invasive species.  These impacts negatively affect waterfowl and other wildlife.

206.    The Plan authorizes the continuation of the leaseland agriculture and cooperative farming programs on Lower Klamath and Tule Lake Refuges.

207.    The mission of the National Wildlife Refuge System is to administer the refuges for the conservation of fish, wildlife, and plant resources and their habitats for the benefit of present and future generations of Americans.  Individual refuge purposes vary slightly but generally focus on the preservation of waterfowl and wildlife.

208.    Given the impacts of leaseland and cooperative farming the Service's determination that these uses are compatible with the mission of the National Wildlife Refuge System and with the specific purposes of the Klamath Basin Complex Refuges is arbitrary, capricious, an abuse of discretion, and not in accordance with Refuge Act, in violation of 5 U.S.C. § 706(2)(A).

**Count Two—System Mission and Refuge Purposes**

209.    The Refuge Act includes a list of substantive duties that the Secretary shall take, through the Service, in administering the National Wildlife Refuge System.  This includes

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

providing for the conservation of fish, wildlife, and plants, and their habitats within the System; ensuring that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations; and assisting in the maintenance of adequate water quantity and water quality to fulfill the mission of the System and the purposes of each refuge.  16 U.S.C. § 668dd(a)(4).  The Service failed to demonstrate its compliance with all three of these duties.

210.    The Plan fails to establish population objectives for unique life stages, such as the breeding and molting life stages, of waterfowl and for multiple refuges throughout the Klamath Basin Complex.

211.    The Plan similarly fails in establishing population objectives for waterbirds and fails to discuss the varying water needs among both waterfowl and waterbirds.

212.    The Plan fails to address the increasing problem of water shortages and avian disease outbreaks.

213.    The Plan fails to adequately disclose and consider impacts from increasing water shortages and continues to prioritize water deliveries to agricultural lease lands in the face of increasing threats to the wetland habitats within the Refuges.

214.    The Plan fails to address impacts to water quality from agricultural practices.

215.    The Secretary has the authority and the duty to direct the Bureau of Reclamation to resolve the within-Project priority for Lower Klamath Refuge water rights.

216.    The Plan fails to analyze viable alternatives for securing water rights and ensuring water deliveries necessary to fulfill refuge purposes, particularly in light of more frequent drought and climatic changes.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

217.    The Service has failed to demonstrate that it is maintaining adequate water

quantity and quality to fulfill the mission of the System and refuge purposes.

218.    The Plan fails to provide for the conservation of fish, wildlife, and plants, and

their habitats within the System.  The Plan fails to ensure that the biological integrity, diversity,

and environmental health of the System are maintained for the benefit of present and future

generations.  The Plan fails to meet the Secretary's duty to assist in the maintenance of adequate

water quantity and water quality to fulfill the mission of the System and the purposes of each

refuge.  16 U.S.C. § 668dd(a)(4).

219.    The Plan fails to meet the substantive statutory requirements of the Refuge Act

and is consequently arbitrary, capricious, an abuse of discretion, and not in accordance with law,

in violation of 5 U.S.C. § 706(2)(A).

## Count Three—Transfer of Authority Over Leaselands

220.    The Refuge Act requires that the National Wildlife Refuge System, including all

lands, waters, and interests therein, be administered by the Secretary through the Service.

16 U.S.C. § 668dd(a)(1).

221.    The Plan authorizes continued administration of the leaseland agricultural

program on Lower Klamath and Tule Lake Refuges by the Bureau of Reclamation.

222.    The Service's decision to transfer authority over Refuge leaselands to

Reclamation is beyond its statutory authority under the Refuge Act and is thereby arbitrary,

capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF:
#### (Violations of the CWA and the APA)

223.    Plaintiffs re-allege and incorporate all preceding paragraphs into the claim set

forth below.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

224.    EPA approved the TMDL for the Lost River in 2008, which assigned specific load allocations for pollution from runoff and irrigation return flows within Lower Klamath and Tule Lake Refuges.  The Lost River TMDL Action Plan assigned additional responsibilities to the Service.

225.    Section 313 of the CWA requires compliance with "all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution."  33 U.S.C. § 1323.

226.    Agricultural runoff and irrigation return flows from agricultural leaselands within Tule Lake and Lower Klamath Refuges are contributing to violations of water quality standards in the Klamath Straits Drain.

227.    Discharges from the Klamath Straits Drain contribute to violations of water quality standards in the Klamath River downstream from the Klamath Straits Drain.

228.    The Service has a duty to ensure that the uses and management action authorized in the Plan—including the agricultural leasing program—comply with water quality standards. Contrary to the Service's assertion, Section 313 does not provide the Service with discretion to defer planning efforts until a later date.  Rather, the Service was required to demonstrate in the Plan that it complied with its obligations under the CWA.

229.    Section 313 places a duty on the Service to comply with federal CWA requirements and state water quality standards for both point and nonpoint source activities on federal lands and waters.  The Plan authorizes continued violations of state water quality standards and load allocations.  The Service has not demonstrated how it complied with its CWA obligations in approving the Plan.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

230.    The Service's actions described above are not in accordance with the law, are without observance of the procedures required by law, and are arbitrary and capricious within the meaning of the APA.  5 U.S.C. § 706(2)(A).

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Service has violated the National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.*, by issuing an EIS without first satisfying the requirements of NEPA with respect to adequate consideration of a range of alternatives and disclosure and assessment of the direct, indirect and cumulative impacts of the Plan;

B.    Declare that the Service has violated the Kuchel Act, 16 U.S.C. §§ 695k–r, by issuing a final decision and Plan that conflicts with the mandates of the Kuchel Act;

C.    Declare that the Service has violated the National Wildlife Refuge System Administration Act, as amended by the National Wildlife Refuge System Improvement Act, 16 U.S.C. §§ 668dd–668ee, by issuing a final decision and Plan that authorizes uses that are not compatible with Refuge purposes, fails to fulfill the System mission and Refuge purposes, and transfers administration over Refuge leaselands to the Bureau of Reclamation;

D.    Declare that the Service has violated the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, by failing to comply with applicable water quality standards;

E.    Declare that Defendants' issuance of the ROD and the Plan is arbitrary, capricious, an abuse of discretion, and/or not in accordance with the law under the APA, 5 U.S.C. § 706(2)(A), and violates applicable law for the reasons specified above;

F.    Set aside and vacate the Plan, EIS, and ROD;

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

G.    Enjoin Defendants from approving or extending agricultural leases on Lower Klamath and Tule Lake Refuge until the Service completes a revised Plan in compliance with NEPA, the Kuchel Act, Refuge Act, and Clean Water Act;

H.    Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

I.    Grant such additional relief as this Court deems just and proper.

DATED this 17th day of January 2017.

<div style="margin-left:40%">

Respectfully submitted,

s/ Maura C. Fahey
Maura C. Fahey, OSB # 133549
Tel: (503) 525-5722
Email: maura@crag.org
Emma A.O. Bruden, OSB # 163525
Tel: (503) 525-2725
Email: emma@crag.org
Ralph O. Bloemers, OSB # 984172
Tel: (503) 525-2727
Email: ralph@crag.org
Crag Law Center
917 SW Oak St., Suite 417
Portland, Oregon 97205
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

</div>