Paul D. Ruprecht (OSB #132762)
Western Watersheds Project
PO Box 12356
Reno, NV 89510
(208) 421-4637
paul@westernwatersheds.org

David H. Becker (OSB #081507)
Law Office of David H. Becker, LLC
833 SE Main Street # 302
Portland, Oregon 97214
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) | Case No.: 1:17-cv-00069-CL (lead) <br> Case No.: 1:17-cv-00098-CL (trailing) <br> Case No.: 1:17-cv-000468-CL (trailing) |
| Plaintiff, | ) ) | Case No.: 1:17-cv-000531-CL (trailing) |
| v. | ) ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) | **MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| Defendant, | ) ) | Oral Argument Requested |
| MICHAEL BYRNE, et al., | ) ) | |
| Defendant-Intervenors. | ) ) | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Plaintiff Western Watersheds Project (WWP) hereby moves the Court to enter Summary Judgment in its favor on its claims that the U.S. Fish and Wildlife Service (Service) violated the National Environmental Policy Act (NEPA), the National Wildlife Refuge System Administration Act, as amended by the Refuge Improvement Act (Refuge Act), and the Kuchel Act in authorizing livestock grazing on the Clear Lake National Wildlife Refuge through its Environmental Impact Statement (EIS), Comprehensive Conservation Plan (CCP), and Record of Decision (ROD) adopting the CCP/EIS. Summary Judgment is appropriate because these claims involve no genuine dispute of material fact, and WWP is entitled to judgment as a matter of law.[1] Pursuant to Local Rule 7-1, the undersigned certify that the parties have conferred and have been unable to resolve the motion.

---

[1] This motion is supported by the accompanying Memorandum in Support; the Complaint; the Declarations of Dr. Clait Braun, Karen Klitz, and Dr. Michael Connor, filed herewith; and such other and further material as may be presented to the Court before decision hereon.

**MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

<u>TABLE OF CONTENTS</u>

**Page**

MOTION FOR SUMMARY JUDGMENT………………………………………………………i

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT……………...ii

TABLE OF CONTENTS………………………………………………………………………ii

TABLE OF AUTHORITIES……………………………………………………………….iv

GLOSSARY OF ACRONYMS………………………………………………………………vii

INTRODUCTION…………………………………………………………………………...1

FACTUAL BACKGROUND………………………………………………………………..3

    I.      The Klamath Basin National Wildlife Refuges and CCP Process. …………………...3

    II.     Clear Lake National Wildlife Refuge. ……………………………………………..4

    III.   Sage-Grouse and Impacts from Livestock Grazing. ……………………………….5

        A. <u>Sage-Grouse Biology and Life Cycle Needs.</u> ………………………………5

        B. <u>The Impacts to Sage-Grouse from Livestock Grazing.</u> …………………………..7

    IV.   Sage-Grouse and Livestock Grazing on Clear Lake Refuge. ………………………..9

        A. <u>The Decline of the Clear Lake Sage-grouse Population.</u> …………………………9

        B. <u>Current Range and Habitat for the Clear Lake Population.</u> ……………………..10

        C. <u>Grazing in and Around the Clear Lake Refuge and Impacts to Sage-Grouse.</u> ….11

    V.     The Endangered Sucker Species and Impacts from Livestock Grazing. ……………13

ARGUMENT………………………………………………………………………………15

    I.      STANDARD OF REVIEW…………………………………………………………15

    II.     THE SERVICE VIOLATED NEPA AND THE KUCHEL ACT BY REFUSING TO
        CONSIDER ALTERNATIVES THAT WOULD REDUCE OR ELIMINATE
        LIVESTOCK GRAZING AT CLEAR LAKE REFUGE. …………………………16

A.  NEPA Requires Consideration of Alternatives That Reduce or Eliminate Grazing Because They Are Reasonable and More Consistent with the Purpose of the Refuge. ……………………………………………………………………..16

B.  Without Reduced- and No-Grazing Alternatives, Neither the Service nor the Public Can Compare the Potential Benefits of Passive Restoration to Continued Grazing. ……………………………………………………………………18

C.  The Kuchel Act Also Requires Consideration of Reduced-Grazing Alternatives. …………………………………………………………..20

D.  The Service is Wrong That It Lacks Authority to Consider Alternatives That Would Reduce or Eliminate Grazing on the West Side of the Refuge by Livestock Authorized on the Modoc National Forest. …………………………………...21

III.   THE SERVICE VIOLATED NEPA AND THE REFUGE ACT BY FAILING TO ADEQUATELY CONSIDER IMPACTS TO SAGE-GROUSE AND ENDANGERED SUCKER SPECIES AT CLEAR LAKE. ………………………...22

A.  The Service's Determination That Spring Grazing Would Not Affect Sage-Grouse Lacks a Factual Basis, and the Failure to Evaluate Effects of Grazing on Sage-Grouse Nesting Violates NEPA. …………………………………………………...23

B.  The Service Violated NEPA by Ignoring Impacts to Suckers and Their Habitat. 25

C.  The Service Violated NEPA and the Refuge Act's Compatibility Requirement by Failing to Analyze Cumulative Impacts to Sage-Grouse or Suckers from Grazing on the Adjacent National Forest. …………………………………………..27

IV.   THE SERVICE'S COMPATIBILITY DETERMINATION FOR GRAZING AT CLEAR LAKE REFUGE VIOLATES THE REFUGE ACT. ………………………...30

A.  The Service's Approval of So-Called "Restoration" Grazing on the U's Upland Habitat Lacks a Rational Basis in Fact. ………………………………………31

B.  The Clear Lake Grazing CD Does Not Demonstrate that Grazing in Shoreline Habitat Contributes to Refuge Purposes Given its Serious Conflicts with Sage-Grouse, Suckers, and Other Wildlife. …………………………………………...34

CONCLUSION…………………………………………………………………………..35

# TABLE OF AUTHORITIES

## Cases

*Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273 (D. Del. 2011) …………………...31

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) …………………23

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) …………………29

*Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*,
  857 F.2d 505 (9th Cir. 1988) …………………………………………………………19

*Idaho Conservation League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992) …………..……17

*Klamath Siskiyou Wildlands Ctr. v. Grantham*, 642 F. App'x 742 (9th Cir. 2016) ...26, 27

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) …………………………………….……29

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ……………………8, 15, 18, 27

*League of Wilderness Defenders-Blue Mtns. Biodiversity Proj. v. U.S. Forest Serv.*,
  689 F.3d 1060 (9th Cir. 2012) …………………………………………………..17

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) …………………………………..16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) …………………………………………………………………16

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) …………17

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) ………...16

*Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005) ……………..19

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) …...22

*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007) ...26

*Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) …………………………24

*Te-Moak Tribe v. U.S. Dep't of the Interior*, 608 F.3d 592 (9th Cir. 2010) ………...27, 30

*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009) ………………...25

*W. Watersheds Proj. v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) …………………………18

*W. Watersheds Proj. v. Bennett*, 392 F. Supp. 2d 1217 (D. Idaho 2005) ...................28

*W. Watersheds Proj. v. Jewell*, 56 F. Supp. 3d 1182 (D. Idaho 2014) .....................29

*W. Watersheds Proj. v. Rosenkrance*, No. 09-cv-00298-EJL,
    2011 WL 39651 (D. Idaho Jan. 5, 2011) ..............................................29

*W. Watersheds Proj. v. Salazar*, 843 F. Supp. 2d 1105 (D. Idaho 2012) ...........8, 23, 29

*W. Watersheds Proj. v. Salazar*, No. 4:08-cv- 516-BLW,
    2011 WL 4526746 (D. Idaho Sept. 28, 2011) .....................................18, 21

## Statutes

5 U.S.C. § 706(2)(A) ..............................................................16

5 U.S.C. § 706(2)(D) ..............................................................16

16 U.S.C. § 668dd(a)(4)(D) ........................................................30

16 U.S.C. § 668dd(d)(1)(A) ........................................................30

16 U.S.C. § 668dd(d)(3)(A) ........................................................30

16 U.S.C. § 668dd(d)(3)(B) .........................................................4

16 U.S.C. § 668dd(e)(1)(A) .........................................................3

16 U.S.C. § 668dd(e)(1)(E) .........................................................3

16 U.S.C. § 668ee(1) ..............................................................30

16 U.S.C. § 668ee(3) ..........................................................23, 30, 34

16 U.S.C. § 695 ...................................................................17

16 U.S.C. § 695*l* ...........................................................5, 20, 21, 24

16 U.S.C. § 695*n* ................................................................21

40 U.S.C. § 4332(C)(iii) ..........................................................16

## Other Authority

Forty Most Asked Questions Concerning CEQ's National Environmental
Policy Act Regulations, 46 Fed. Reg. 18,013 (Mar. 23, 1981) …………………………18

## Regulations

40 C.F.R. § 1500.1(b) …………………………………………………………...22

40 C.F.R. § 1502.1 …………………………………………………………..18, 22

40 C.F.R. § 1502.9(b) ………………………………………………………...34

40 C.F.R. § 1502.14 ………………………………………………………16, 19

40 C.F.R. § 1508.7 …………………………………………………………..27, 28

40 C.F.R. § 1508.27(b)(7) …………………………………………………………27

50 C.F.R. § 25.12 …………………………………………………………...23, 30, 34

50 C.F.R. § 25.12(a) …………………………………………………………...31

50 C.F.R. §§ 25.41–45 …………………………………………………………22

50 C.F.R. § 26.41(a)(8) …………………………………………………………...23, 27

50 C.F.R. § 28.21 …………………………………………………………22

50 C.F.R. § 28.31 …………………………………………………………22

50 C.F.R. § 28.42 …………………………………………………………22

50 C.F.R. § 29.1 …………………………………………………………...22, 31

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| AMA | Clear Lake Sage-grouse Recovery Active Management Area |
| APA | Administrative Procedure Act |
| AUM | Animal Unit Month |
| BA | Biological Assessment |
| BO | Biological Opinion |
| BLM | Bureau of Land Management |
| CCP | Comprehensive Conservation Plan |
| CD | Compatibility Determination |
| CEQ | Council for Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| PAC | Sage-grouse Priority Area for Conservation |
| PMU | Population Management Unit |
| Refuge Act | National Wildlife Refuge System Administration Act, as amended by the Refuge Improvement Act |
| ROD | Record of Decision |
| WWP | Western Watersheds Project |

## INTRODUCTION

Plaintiff Western Watersheds Project (WWP) challenges the U.S. Fish and Wildlife Service's (Service) 2016–2017 analysis and approval of commercial livestock grazing on Clear Lake National Wildlife Refuge. Clear Lake Refuge is one of five national wildlife refuges in the Klamath Basin for which the Service completed a combined Environmental Impact Statement (EIS) and Comprehensive Conservation Plan (CCP) in late 2016, and issued a Record of Decision (ROD) adopting the CCP in early 2017. In that process, the Service violated the standards and procedures required by the National Wildlife Refuge System Administration Act, as amended by the Refuge Improvement Act (the Refuge Act), the Kuchel Act, and the National Environmental Policy Act (NEPA) with respect to grazing at Clear Lake.

Clear Lake National Wildlife Refuge was established in 1911 as a preserve and breeding ground for native birds, including greater sage-grouse. Sadly, it now hosts the only remaining "lek," or breeding area, for a population of sage-grouse that is struggling for its very survival. Once numbering thousands, the entire Devil's Garden/Clear Lake sage-grouse population has shrunk to about 150 birds, and now faces an immediate risk of extinction. The last lek is located on a roughly 6,000-acre peninsula extending into Clear Lake Reservoir that is known as the "U."

Livestock grazing can harm sage-grouse and the sagebrush steppe ecosystem on which they depend in many, well-known ways. Despite this, the Service significantly increased grazing at Clear Lake Refuge through the CCP and EIS challenged here. It approved a new spring grazing season on the "U" that overlaps the sage-grouse breeding period without adequately considering the harmful effects on their breeding activities or nesting habitat, contrary to NEPA. At the same time, the Service refused to even *consider* reducing levels of commercial livestock use of the Refuge. Its failure to analyze a reduced-grazing alternative, or the elimination of

grazing entirely, on Clear Lake Refuge violates NEPA and the Kuchel Act.

While the "U" and other habitat along the shoreline of Clear Lake Reservoir are critical for sage-grouse, the modest-sized Refuge is not large enough on its own to provide for all of the population's needs. Sage-grouse also use habitat on the surrounding Modoc National Forest throughout the year. Livestock grazing on the Forest damages sagebrush steppe habitat and harms sage-grouse when they leave the Refuge. And, because the boundary on one side of the Clear Lake Refuge is not fenced, livestock authorized by the Forest Service enter the Refuge and degrade sage-grouse habitat there, on top of the harms from grazing authorized by the Service. The Service ignored these cumulative impacts to the sage-grouse population in violation of NEPA and the Refuge Act.

Two species of endangered native fishes, the Lost River sucker and shortnose sucker, are also found at Clear Lake Refuge—one of only a few places they still exist. Clear Lake Reservoir and its tributaries in the Willow Creek watershed are designated critical habitat for both species under the Endangered Species Act (ESA). Yet the Service declined to consider whether its management, including grazing authorized on the Refuge, and grazing spill-over from the Modoc National Forest onto the Refuge, would directly or indirectly impact the suckers or their habitat.

Like the sage-grouse, these suckers also rely on areas outside Clear Lake Refuge for life cycle needs. They ascend Willow Creek and Boles Creek (which flow mainly through the Forest before entering the Refuge) each spring to spawn. In evaluating the effects of grazing on suckers, the Service again failed to look beyond the borders of Clear Lake Refuge to consider the additive impacts to suckers and their habitat from grazing activities on Forest Service land.

Under the Refuge Act, the standard for whether livestock may graze on wildlife refuges is substantially stricter than for other federal land. In contrast to public lands administered by the

Forest Service or Bureau of Land Management (BLM)—areas where grazing is presumed to be one of a number of appropriate uses unless explicitly disallowed—on a national wildlife refuge, the standard is reversed. <u>The Service cannot authorize grazing unless it demonstrates that livestock will actually help achieve the purposes of the refuge.</u> Here, the Service's assertions that increased livestock grazing will heal degraded uplands on the "U" and help recover the imperiled sage-grouse population are contrary to evidence in the record. At the same time, the record demonstrates serious harms to sage-grouse from grazing on the Clear Lake Refuge. For all these reasons, the Court should grant WWP's motion for summary judgment.

## FACTUAL BACKGROUND

### I.     The Klamath Basin National Wildlife Refuges and CCP Process.

The magnificent Klamath Basin National Wildlife Refuge complex includes six separate refuges, each protecting important remnant habitat in the Upper Klamath Basin. AR[2] 3130. Perhaps best known for their wetlands and marsh complexes, the refuges are in fact highly diverse, also encompassing grasslands and conifer forest; open water; and, in the case of Clear Lake National Wildlife Refuge, sagebrush steppe uplands characteristic of the Great Basin landscape. AR 3141–62, 3294, 3310, 61682. These habitats support varied and abundant populations of native wildlife, including a number of special status species. AR 3312–27.

In 2010, the Service initiated a process to develop the first ever Comprehensive Conservation Plans for the Klamath Basin Refuges. AR 3130. *See also* 16 U.S.C. § 668dd(e)(1)(A), (E). A CCP for Klamath Marsh Refuge was completed separately first. *Id*. In May 2016, the Service issued a Draft CCP/EIS for the remaining five refuges: Upper Klamath,

---

[2] All "AR" citations herein are to the Second Corrected Administrative Record lodged on January 11, 2018. ECF No. 82.

Lower Klamath, Tule Lake, Bear Valley, and Clear Lake. AR 38173–39867. It issued a Final

CCP/EIS in December 2016. AR 3094–6801. And on January 13, 2017, the Service issued its

ROD, selecting Alternative B for Clear Lake Refuge. AR 4–84. As part of its planning

responsibilities, the Service also made compatibility determinations (CDs) for each use it

authorized at the refuges. AR 260–756; *see* 16 U.S.C. § 668dd(d)(3)(B).

## II.    Clear Lake National Wildlife Refuge.

Clear Lake National Wildlife Refuge is located in Modoc County, California, east of

Lower Klamath and Tule Lake Refuges. AR 3294, 3131 (Klamath Basin Refuges map), 3148,

3393, 54249 (Clear Lake Refuge maps). The Clear Lake Refuge totals about 33,500 acres, of

which roughly 20,000 acres are open water in Clear Lake Reservoir. AR 3147, 3388. Clear Lake

was a natural lake, enlarged by the construction of a dam at its outflow in 1910. AR 3390. The

surrounding landscape is sagebrush steppe uplands composed of sagebrush and other shrubs,

grassland, and juniper communities. AR 3392–94. The Refuge is bounded on all sides by the

Modoc National Forest. AR 3388, 59014, 54249 (map).

The Clear Lake "U" is a peninsula that extends into the reservoir, and comprises the

majority of the upland habitat in the Refuge. AR 3147, 52269, 54249 (map). Annual, non-native

grasses (cheatgrass and medusahead) have invaded portions of the "U," although sagebrush and

native bunchgrasses are still the dominant species throughout. AR 51877–78. Because Clear

Lake Reservoir itself is controlled by the Bureau of Reclamation, the Service's management "is

focused on shoreline and upland habitat." AR 3189, 57973. In addition to the uplands, the

shoreline habitat is important for sage-grouse, mule deer, and pronghorn, due to the abundance

of forbs there. AR 3832, 48810, 48825. Providing "proper fish and wildlife habitat (particularly

for sage-grouse) is the overarching priority for the U." AR 57973.

President William Taft established the Refuge in 1911 "as a preserve and breeding ground for native birds." AR 502, 3147 (citing Executive Order 1332, Apr. 11, 1911).[3] Through the 1964 Kuchel Act, the Refuge was "dedicated to wildlife conservation." 16 U.S.C. § 695*l*. The legislative history of the Kuchel Act highlights the importance of Clear Lake Refuge as "courtship grounds for a large sage grouse flock" and for pronghorn antelope. AR 65522 (Testimony of Secretary of Interior Stewart L. Udall to U.S. Senate, February 23, 1962). A primary purpose of the Refuge is to provide habitat for sagebrush obligate wildlife, including sage-grouse. *See, e.g.*, AR 3104–05, 3147–49, 3170, 3831. Consequently, "sage-grouse habitat restoration is the major habitat-related issue on the refuge." AR 3190.

Another Refuge objective is to protect and maintain habitat for endemic endangered and threatened species, including two species of endangered fishes: The Lost River and shortnose suckers. AR 99, 3101, 3811, 65105.

### III.    Sage-Grouse and Impacts from Livestock Grazing.

A.    Sage-Grouse Biology and Life Cycle Needs.

The greater sage-grouse (*Centrocercus urophasianus*) is the largest North American grouse species. AR 3397. Sage-grouse were once widely distributed throughout the sagebrush biome across the western U.S. and Canada, AR 2369, 55150, with populations numbering in the millions. AR 2372–73. Today, there may be as few as 100,000 sage-grouse left range-wide. *Id.* The range of the species has also declined by about half. AR 2369–70, 55150. Destruction, fragmentation, and degradation of sagebrush habitats over past decades—including harm from

---

[3] Besides sage-grouse, Clear Lake Refuge is also an important site for colonial nesting birds including gulls, terns, cormorants, and the largest colony of American white pelicans in California. AR 3395, 3832–33. However, it is less important for waterfowl than the other Klamath Basin refuges. AR 47241, 48823.

livestock grazing and grazing-related infrastructure, invasive species, and fire—have caused the substantial declines in sage-grouse populations. AR 2376–93, 72343–45.

Sage-grouse are a "keystone species," reflecting the suitability of sagebrush steppe habitat for a number of other species, including pronghorn, sage sparrow, sage thrasher, and Brewer's sparrow. AR 59014. As their name suggests, sage-grouse are sagebrush obligates, meaning they depend on sagebrush habitats year-round to provide roosting, cover, and food. AR 2367, 72338.[4]

Sage-grouse have specific seasonal habitat needs. AR 3831, 2367–68. Seasonal habitat includes breeding, nesting, brood-rearing, and wintering areas. AR 2367–68, 69473–75. Although sage-grouse are present at the Clear Lake Refuge in all seasons, AR 61684, the Refuge is not large enough to provide completely for the needs of the population, which must use nearby National Forest lands throughout the year as well. AR 3397, 51906, 52289.

Each year, by early March, sage-grouse move to areas known as leks, where males perform breeding displays in the early morning. AR 2367, 55151. This activity may occur into May. AR 51851. After mating, female grouse establish nests. AR 2367, 51851–52. The nesting season lasts from April through June. AR 51851–52. The nest is a shallow depression on the ground, often under brush and taller grasses, which provide scent, visual, and physical barriers against predators. AR 51852, 68418, 72342. The CCP creates a new, additional spring grazing season on the "U" that would overlap with sage-grouse mating and nesting seasons on the Clear Lake Refuge. AR 503, 3242.

Sage-grouse require forbs—herbaceous flowering plants other than grasses. AR 55151,

---

[4] The sagebrush steppe ecosystem is comprised of sagebrush in the overstory; native grasses, forbs, and litter in the understory; and biological soil crusts filling interspaces between vegetation. AR 85709.

85709–10. The forbs provide nutrition for the hen, increasing her chances of successfully giving

birth to, and raising, her chicks. AR 2367, 51853. An herbaceous understory provides access to

insects and forbs, both for the female before breeding and by her chicks after hatching. AR

51854. During summer months, when brood-rearing occurs, sage-grouse move to wetter habitats

like springs, wet meadows, and shorelines because these areas have abundant forb cover. AR

3832, 2368, 51854–55. Under the CCP, grazing would continue to occur during summer on the

Clear Lake Refuge. AR 502–03, 3234–45.

     B.  <u>The Impacts to Sage-Grouse from Livestock Grazing.</u>

     Grazing by domestic livestock on the Clear Lake Refuge has direct and indirect negative

impacts on sage-grouse. *See* AR 25964, 69477–80. Livestock compete directly with sage-grouse

for resources, including grasses and forbs. AR 2391–92. Livestock reduce complex cover by

trampling vegetation, including sagebrush seedlings. AR 2392, 2680, 50685, 72345. Livestock

also trample and degrade springs, seeps, shorelines, meadows, and other riparian areas that are

important brood-rearing habitat for sage-grouse, leading to reductions in their extent or flows,

decreased vegetation species richness and cover, and increased erosion. AR 2391, 85726–27.

     Grazing reduces the hiding cover required by sage-grouse, both over the long term and

seasonally. AR 2391–92, 69473. Sagebrush ecosystems evolved without heavy grazing, AR 777,

2391, 1890, and native bunchgrasses are therefore highly sensitive to grazing disturbance,

especially during their spring growth period. AR 15952–55, 69477. Livestock preferentially

graze the larger bunchgrasses that provide the best hiding cover for sage-grouse. AR 26781,

26790. Over time, grazing reduces these grazing-intolerant species. AR 24089–90. The reduction

in grass height from annual grazing in nesting areas also negatively affects nesting success. AR

2391, 2683, 24091–95, 51852–53, 69477–78 (describing grass height as a factor affecting sage-

grouse nesting success).[5]

Sage-grouse experts recommend managing breeding and nesting habitat to ensure an average of 7 inches of herbaceous vegetation height, AR 2391, 19154–55, 72348, as well as avoiding twice-over grazing (two grazing periods in one year), and any grazing between March 1 and June 20 or between August 1 and November 15. AR 2622, 2685, 16678–79; *see also W. Watersheds Proj. v. Salazar*, 843 F. Supp. 2d 1105, 1115 (D. Idaho 2012) ("to avoid conflicts with sage grouse nesting and late brood-rearing habitat grazing should be limited to mid-summer (June 20 to August 1), and to minimize impacts on herbaceous vegetation prior to the next nesting season it should be limited to late fall and winter months (November 15 to March 1)"). Livestock also directly harm nesting sage-grouse in several ways, including trampling and disturbance that may cause flushing or nest abandonment. AR 2392.

Invasive species, including cheatgrass and medusahead, reduce the quality of sagebrush habitat. AR 2387. Livestock facilitate the introduction and spread of invasive plants in various ways, including by transporting their seeds, and by disturbing and damaging soils, in which cheatgrass thrives. AR 1895–1904, 2392, 3238, 26790–93. Not surprisingly, in the Clear Lake area, cheatgrass first appeared in sheep bedding grounds. AR 51885. Preferential grazing of native species by livestock also reduces competition with cheatgrass. AR 26787–95.

---

[5] In a declaration submitted herewith, Dr. Clait Braun summarizes the harms to nesting sage-grouse when livestock remove the cover they rely on to hide their nests. Declaration of Dr. Clait Braun ¶¶ 16–18 (citing comments and scientific literature he submitted to the Service before it issued the CCP that appear at AR 2620–924). Dr. Braun also explains that the Service's failure to fully analyze this impact undermines the validity of the CCP/EIS. *Id*. ¶¶ 17–18. The Court should consider the Braun Declaration because it explains that the Service omitted consideration of important factors in its authorization of grazing at Clear Lake, reiterates comments by Dr. Braun that were before the Service when it issued the CCP, and summarizes other scientific literature that also appears in the record. *See Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005).

Grazing-related infrastructure—such as fencing, water troughs, pipelines, and corrals—is largely absent from the Clear Lake Refuge, AR 57973, 57977, but such infrastructure in the adjacent National Forest threatens the Refuge's sage-grouse population when birds move onto forest lands. *See, e.g.*, AR 28361; Exhibit A at 62 (Modoc National Forest Tucker allotment Environmental Assessment[6] describing grazing infrastructure). Sage-grouse can die from colliding with fences during flight. AR 2393, 55196, 69478. Fences and other structures also fragment habitat and create perching areas that allow predatory birds to more successfully hunt and prey on sage-grouse and their nests, leading sage-grouse to instinctively avoid such structures. AR 2379–81, 2393, 72345.

**IV.    Sage-Grouse and Livestock Grazing on the Clear Lake Refuge.**

A.    The Decline of the Clear Lake Sage-grouse Population.

By all accounts, the abundance of sage-grouse in and around Clear Lake Refuge has declined precipitously over the past decades. AR 3397, 51863–64. The Service estimates the Clear Lake population's current numbers at only about 150. AR 2618; *see also* AR 54243 (estimating between 160 and 260 grouse in 2013), 61652 (estimating the total population at less than 100 in 2008 and less than 50 in 2010).[7]

The Clear Lake sage-grouse population is part of a management area known as the Devil's Garden/Clear Lake Sage-grouse Population Management Unit (PMU), which includes northwest Modoc County. AR 51846–87. Modoc County alone supported as many as 14,000 sage-grouse as recently as 1970. AR 51863. At least 56 separate leks were originally recorded in the PMU, with most concentrated around Clear Lake. *Id*. But, by 2002, only a single lek—

---

[6] This document is included in the Administrative Record at AR 99785–830 and at 102581–626, but is missing every other page in both cases. WWP attaches it as Exhibit A in its entirety.
[7] In an attempt to save the population, the Service has translocated sage-grouse from the Hart Mountain Refuge in Oregon and other areas since 2005. AR 3402–04, 51870, 51921.

located on the Clear Lake "U"—was still active. AR 3397, 51864. And attendance at that lone

lek has declined by 80% since 1992. AR 3397, 51877. In 2016, the last year for which the

Service has data, only 33 males were counted at the "U" lek. AR 2618.

The sage-grouse found at Clear Lake are part of the broader Klamath OR/CA population,

described as "a small population on the east side of the Klamath Basin in Oregon and

California." AR 51850, 55225–26. However, within the Klamath OR/CA population, sage-

grouse no longer occur in Oregon. AR 51871, 55226. And in California they are now only

present in the area surrounding Clear Lake Reservoir, where they are in "immediate risk of

extinction." AR 51871, 55225–26; *see also* 54234 (the population is "nearly extirpated").

The Clear Lake population represents the westernmost extent of the range of the greater

sage-grouse. AR 51853; Complaint ¶ 95; Answer ¶ 95. The disappearance of sage-grouse at

Clear Lake would result in a significant range contraction for the species because the next closest

population is 70 to 80 km to the east. Complaint ¶ 96; Answer ¶ 96. Accordingly, the Service has

identified the current range of the Clear Lake sage-grouse population as a Priority Area of

Conservation (PAC), defined as a "key habitat [] essential for sage-grouse conservation." AR

55138, 55157–58.

The Service attributes the decline of sage-grouse in the PMU to habitat degradation,

including increase of exotic annual grasses. AR 61656. Within the Refuge itself, several fires

(both prescribed and naturally caused) have reduced sagebrush habitat, and facilitated invasion

by cheatgrass and medusahead. AR 3394, 58856.

B.  Current Range and Habitat for the Clear Lake Population.

Since sage-grouse have disappeared elsewhere in the PMU, management of the

remaining birds is focused on what is known as the Clear Lake Active Management Area

(AMA). AR 3397, 51846–47. The 254,000-acre AMA encompasses Clear Lake Refuge and the adjacent Modoc National Forest grazing allotments including Tucker, Carr, Mammoth, and Clear Lake. AR 51846–47, 51879, 51886 (PMU and AMA maps). The Service participates in a local sage-grouse "working group" whose goal is to increase the current population of about 150 to a self-sustaining population of at least 500 sage-grouse in the Clear Lake AMA. AR 51918, 54234.

Sage-grouse are present at Clear Lake Refuge year in all seasons. AR 51858, 61684. As noted, the only known lek for the sage-grouse population is located on the "U," AR 3397, and sage-grouse use that area year-round. *Id.*; AR 61658–661. Hens also nest on the "U." AR 26240, 26243, 55455. The shoreline habitats surrounding Clear Lake Reservoir provide important brood-rearing habitat during summer and fall because of the availability of a number of forb species there. AR 507, 3397, 51878, 54283, 55460.

But the Refuge itself is not large enough to provide for the needs of sage-grouse on its own, and the population also extensively uses the Forest Service-managed portions of the AMA year-round. AR 2621, 3397, 29004, 52291, 54241–42, 82724. Specifically, the Clear Lake Hills west of the Refuge on the Tucker allotment are an important nesting area. AR 26243, 51853, 55455, 61660–61. Sage-grouse also use areas south of the Refuge, including Boles Creek, Mowitz Creek, and the Pothole Valley—all within the Forest Service's Carr allotment. AR 28801–06, 51869–70, 51906, 61658–59. Together the Refuge and surrounding national forest lands form the current range of the Clear Lake sage-grouse population.

C.  Grazing in and Around the Clear Lake Refuge and Impacts to Sage-Grouse.

Coinciding with the decline of sage-grouse at Clear Lake, livestock grazing has occurred in and around the Refuge for over a century, beginning in the late 1800s. AR 51878–85, 51899, 59016. Nearly the entire AMA, including private lands, is used for grazing and has been since

that time. AR 51900.

Four grazing allotments are directly adjacent to Clear Lake Refuge on the Modoc National Forest: Tucker, Carr, Clear Lake, and Mammoth. AR 51879, 51885–88. Grazing occurs yearly on these allotments under permits issued by the Forest Service, including during times when sage-grouse use them for nesting and other purposes. *See* AR 26401–12, 29014–18 (annual operating instructions for Modoc National Forest grazing allotments).

On Clear Lake Refuge itself, cattle use "was largely unregulated prior to the mid 1990s," when fencing was constructed on the north, east, and south boundaries of the Refuge. AR 51878. At that time, the Service considered "livestock from Forest Service grazing allotments" to be the "number one problem at Clear Lake." 48819, 65106 (describing negative impacts from springtime grazing by livestock from Forest Service allotments).

In recent years, the Service has authorized grazing on the Clear Lake "U" annually from mid-July through mid-November by about 170 cow-calf pairs, for a maximum of 600 animal unit months (AUMs).[8] AR 3554, 13534, 57973. This grazing is authorized under a special use permit issued to Robert Byrne Company. AR 503–04, 52300, 54062, 60501 (Special Use Permits). The "U" does not have defined pastures, cross fencing, watering sites, or other livestock infrastructure. AR 57973, 57977. Therefore, livestock drink from Clear Lake Reservoir and "tend to stay fairly close to the waterline." AR 507, 57977.

There is no boundary fence on the west side of the Refuge and each year, livestock authorized to graze on the Forest Service's Tucker allotment still enter the Refuge. AR 503, 3558. Under an agreement between the Service and the Modoc National Forest, approximately 300 cattle from Forest Service land access the western shoreline of Clear Lake for around three

---

[8] An AUM is the amount of forage required to feed a 1,000-pound cow for one month. AR 4919.

weeks beginning July 15. AR 503, 28365, 60808.

In addition to the summer and fall use, the CCP/EIS's Alternative B creates a new, additional spring grazing season somewhere on east side of the "U." AR 503, 3242, 3556. The Service would allow construction of two 1,500 acre pastures with new fencing, which would be open at the lake. AR 503, 3242, 3556. It would authorize 300–500 cattle to graze in the pastures from March 1 to mid-April, ostensibly to "control exotic annual grasses and assist with restoration of habitat." AR 503, 3242. Thus, the "U" would be grazed two times each year, spring and fall. The spring grazing season would overlap the sage-grouse breeding and nesting season on the "U." *See supra* pp. 6, 11.

## V.    The Endangered Sucker Species and Impacts from Livestock Grazing.

Livestock grazing in and around the Clear Lake Refuge also affects shortnose suckers (*Chasmistes brevirostris*) and Lost River suckers (*Deltistes luxatus*), which are endemic to the Upper Klamath Basin. *See* AR 131, 3321, 52002.

Both species were listed as Endangered under the ESA in 1988. AR 109519–523. Lost River and shortnose suckers were once extremely abundant in the Upper Klamath Basin. 83580, 110244. But their habitat within the Lost River watershed is now largely fragmented and disconnected. AR 47116. Threats to the species include water diversions and water quality issues that result from removal of riparian vegetation and livestock grazing. AR 110238, 110265–67. Sucker populations are highly vulnerable to drought because of reduced and earlier spring runoff, and the Service predicts that climate change will reduce water in snow-fed rivers and streams in the Upper Klamath Basin in the future. AR 3296–97, 110264.

Lost River and shortnose suckers inhabit Clear Lake Refuge, which is designated critical habitat for both fish. AR 106, 108, 3571. Clear Lake and its tributaries host one of only two

remaining spawning populations of Lost River suckers, and one of three remaining spawning

populations of shortnose suckers. AR 3321. The area is "deemed critical for [the] recovery" of

these species. AR 83578.

The suckers' habitat in and around Clear Lake Refuge includes Clear Lake Reservoir,

Willow Creek, and Boles Creek. AR 52002, 70140–46, 70173–74. Lost River and shortnose

suckers spawn from February through May, generally in streams with riffles or runs with gravel

and cobble substrate, moderate flows, and depths of less than four feet. AR 3321, 51996. At

Clear Lake, both species spawn in the Willow Creek watershed in February to May. AR 26873,

52002, 56094. After hatching, sucker larvae drift downstream to Clear Lake Reservoir. AR 3321,

116218. In a typical year, 80 percent of larval suckers have reached Clear Lake from the Willow

Creek spawning sites by April 15th. AR 52021.

After arriving at Clear Lake Reservoir, larvae inhabit shallow, shoreline areas in water 4

to 20 inches deep. AR 3321, 56054, 86325, 86329. Shallow water and shorelines are a "primary

constituent element" of critical habitat for the larval and rearing life stages of these species. AR

3322. Emergent vegetation or flooded grasses and plants remaining from the previous season

provide cover for the larvae after being inundated by rising water levels in the spring. AR 3321,

56094. The larvae remain in shallow water, near-shore habitat through summer and into fall. AR

3321, 56054, 110253. One-year-old juveniles also occupy shallow water habitats during April

and May. AR 116245.

Cattle grazing causes substantial harm to sucker habitat generally and degrades water

quality at Clear Lake. AR 56116, 70181. Disturbance from livestock accessing shoreline and

surface water at Clear Lake creates turbidity. AR 3560. The Service has previously noted that

removing grazing from the "U" would benefit endangered suckers. AR 64793, 65110, 65114.

MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT—14

Livestock have significant impacts on soils, and grazing along spawning streams removes vegetation, resulting in loss of cover, bank destabilization, and sedimentation, which can bury suitable spawning substrates. AR 86326, 91400–408. Willow Creek and Boles Creek flow primarily through the Modoc National Forest. AR 52002, 70181. Water impoundments are another threat to suckers in the Willow Creek watershed. AR 26849, 26873, 26877.

In 1997, the Service issued a biological opinion (BO)[9] for livestock grazing on the Modoc National Forest allotments within the range of the Lost River and shortnose suckers, including the allotments surrounding Clear Lake Refuge. *See* Exhibit 1 to Connor Decl. The BO describes the harmful effects of grazing in those areas in detail. *Id*. at 108–13.

In January 2017, the Service completed a biological assessment (BA) to assess how its actions under the CCP would affect the suckers. AR 85. The BA notes that grazing at Clear Lake has the potential to impact suckers and their critical habitat. AR 126, 132. Nonetheless, the CCP/EIS did not consider any impacts to suckers or their critical habitat, stating that "there is no management action for the Service to implement related to sucker populations." AR 3245. With respect to impacts from livestock grazing specifically, the Service claimed it "has no empirical data that shows current grazing practices adversely affect" sucker habitat. AR 508, 3571.

## ARGUMENT

## I.    STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), this Court shall hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[9] The Service stated that it did not consider this BO in developing the CCP and refused to include it in the administrative record. *See* Ex. B at 6, 19 (addressing item 3(B)(xii)). However, because the BO describes a significant factor—effects of grazing on suckers in the area surrounding the Refuge—that the Service failed to consider in assessing the impacts of grazing authorized on the Refuge under the CCP, this Court should consider it. *See Lands Council*, 395 F.3d at 1029–30.

MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT—15

accordance with law," or that were adopted "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). A decision is unlawful under the APA standard if the agency ignored an important aspect of the problem, offered an explanation that was counter to the evidence before it, or was so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court must determine if the agency based its decisions on consideration of the relevant factors and whether it articulated a rational connection between the facts found and the conclusions it made. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).

## II.    THE SERVICE VIOLATED NEPA AND THE KUCHEL ACT BY REFUSING TO CONSIDER ALTERNATIVES THAT WOULD REDUCE OR ELIMINATE LIVESTOCK GRAZING AT CLEAR LAKE REFUGE.

In its CCP process, the Service analyzed only alternatives that would permit livestock grazing at Clear Lake Refuge at previously-authorized levels, or that would increase grazing substantially. AR 3234–3245. Both NEPA and the Kuchel Act obligate the Service to consider the potential benefits of reduction or elimination of grazing at Clear Lake. Accordingly, the agency's failure to evaluate reduced- or no-grazing alternatives violates both statutes.

### A.  NEPA Requires Consideration of Alternatives That Reduce or Eliminate Grazing Because They Are Reasonable and More Consistent with the Purpose of the Refuge.

In an EIS, the Service must study, develop, and describe alternatives to the proposed action, and analyze "all reasonable alternatives." 40 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.14. The alternatives analysis is "the heart of the environmental impact statement," and the agency must "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. In particular, the Service must consider reasonable alternatives that are more consistent

with the Refuge's purpose of protecting native birds and wildlife. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992) (quotation omitted).

The purpose and need for the action dictates the reasonable range of alternatives. *League of Wilderness Defenders-Blue Mtns. Biodiversity Proj. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). Here, the purpose and need for the Klamath CCP includes "evaluat[ing] existing and proposed uses of each refuge to ensure they are compatible with the refuge purpose(s)," AR 7, 3100, 3132, and "[d]iscuss[ing] the pros and cons of continuing existing agriculture, and the compatibility of agriculture on the refuges." AR 3110, 3175. These issues were selected to "guide[] the development of alternatives" analyzed in the CCP/EIS. AR 3109.

Grazing is an existing agricultural use of Clear Lake Refuge that conflicts with its purpose as a "preserve . . . for native birds" and as a landscape "dedicated to wildlife." AR 3147; 16 U.S.C. § 695. For example, these opposing uses clash in Clear Lake's shoreline habitat. AR 507, 826–27, 65106–18 (noting competition between livestock and native species in shoreline habitat and harmful impacts from grazing there). Therefore, a reasonable range of alternatives would have included analysis of whether a shorter grazing season, smaller grazed area, or fewer cows—or removal of livestock grazing entirely—would better meet the Clear Lake Refuge purposes, including providing habitat for native species like sage-grouse and ESA-listed suckers. *See, e.g.*, AR 4905, 4927, 5148–49, 59768 (comments requesting consideration of alternatives to reduce or eliminate grazing).

According to the CCP, a reasonable alternative is one that could be "reasonably undertaken to achieve refuge goals and refuge purposes." AR 3171; *see also* AR 3733

(alternatives are "different sets of objectives and strategies or means of achieving refuge

purposes"). Reduced- or no-grazing alternatives could have helped achieve the Refuge goals and

objectives of protecting and restoring upland and wetland habitats, including the shoreline of

Clear Lake, which is damaged by livestock. AR 3831–32. But the Service only considered one

set of strategies: re-authorize grazing at previous levels, or *increase* it.

Courts have set aside decisions when the underlying NEPA documents analyzed only

alternatives that maintained or increased grazing, as is the case here, when reduced-grazing or

no-grazing alternatives were viable and more consistent with the underlying purpose of the

protected area being grazed. *See W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1050 (9th Cir.

2013) (Environmental Assessment where each alternative allowed grazing at essentially the same

pre-existing level violated NEPA); *W. Watersheds Proj. v. Salazar*, No. 4:08-cv-516-BLW, 2011

WL 4526746, at *13–*15 (D. Idaho Sept. 28, 2011) (BLM was required to consider reduced-

grazing and no-grazing alternatives in Monument Plan EIS).

### B. Without Reduced- and No-Grazing Alternatives, Neither the Service nor the Public Can Compare the Potential Benefits of Passive Restoration to Continued Grazing.

NEPA's alternatives requirement also serves to inform the public of "reasonable

alternatives that would avoid or minimize impacts," 40 C.F.R. § 1502.1, or that "might be

pursued with less environmental harm." *Lands Council*, 395 F.3d at 1027. Likewise, a "no-

action" alternative, such as not authorizing grazing, "provides a benchmark, enabling decision-

makers to compare the magnitude of environmental effects of the action alternatives." Forty

Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 3A,

46 Fed. Reg. 18,013, 18,027 (Mar. 23, 1981). The EIS's alternatives analysis must "present the

environmental impacts of the proposal and the alternatives in comparative form, thus sharply

defining the issues and providing a clear basis for choice among options by the decision-maker and the public." 40 C.F.R. § 1502.14. Because the Service considered no changes to grazing except *increased* grazing, the public was deprived of any comparison to the potential benefits of restoring degraded uplands passively (through rest from grazing), and to fewer impacts to native species from livestock. Thus, neither the Service decision-makers nor the public could undertake an "informed comparison" between the effects of grazing, less grazing, or no grazing. *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005).

For example, the Service did not analyze whether native bunchgrasses on the Clear Lake "U" might be better able to compete with cheatgrass and medusahead under *less* pressure from grazing by domestic livestock, instead of more, *see, e.g.*, AR 2358—even though substantial evidence in the record suggests that grazing causes invasive plants to establish, persist, and spread while leading to decline of native bunchgrasses. *See supra* pp. 7–8.

Nor did the Service discuss impacts to sage-grouse and suckers or their habitat compared to a baseline of no impacts to these species if livestock were absent from the Refuge. *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988) ("Without establishing the baseline conditions . . . there is simply no way to determine what effect the [action] will have on the environment, and consequently, no way to comply with NEPA"). According to the Service itself in its 1994 and 1996 Clear Lake grazing Environmental Assessments (EAs), removal of livestock would greatly benefit suckers, pronghorn, sage-grouse and other species. AR 65110, 65114, 64793–94, 64800.

Other evidence in the record documents the significant recovery of degraded landscapes when grazing is eliminated. AR 19796–860, 22664–75 (photographs and other documentation of the remarkable recovery of riparian and upland areas on Hart Mountain National Antelope

Refuge twenty years after grazing was phased out there). In fact, since the permanent removal of livestock at Hart Mountain Refuge in 1994, the Service has relied on the robust population of sage-grouse there as a source for augmenting Clear Lake's wavering population in an attempt to keep it from blinking out altogether. AR 2666, 17372, 19791 (noting sage-grouse numbers increased after removal of grazing at Hart Mountain Refuge). But the EIS offers the public and the Service's decision-makers no comparative analysis of the relative benefits of reducing or discontinuing grazing on the Refuge, thus violating NEPA's requirement for consideration of reasonable alternatives.

### C.  The Kuchel Act Also Requires Consideration of Reduced-Grazing Alternatives.

In response to requests that the CCP/EIS analyze reduced-grazing alternatives, the Service stated that it had not done so, in part, because "[c]onsistent with the Kuchel Act, the Refuge incorporates agricultural practices like grazing to help achieve its wildlife and habitat objectives." AR 4918. The Service is wrong to imply that the Kuchel Act requires it to re-authorize the same levels of livestock grazing at Clear Lake Refuge. Indeed, the Service's own attorneys have "advised the refuge that the Kuchel Act does not require the refuge to have farming." AR 50198.

The Clear Lake Refuge is first and foremost a refuge and breeding area for birds: the Kuchel Act initially declares that it and the other Klamath refuges are "dedicated to wildlife conservation." 16 U.S.C. § 695*l*. The Kuchel Act then requires only "full consideration of optimum agricultural use" to the extent it is consistent with wildlife conservation and waterfowl management. *Id*. *Consideration* of grazing obviously does not mean that grazing is required—particularly if inconsistent with wildlife conservation. Moreover, "full consideration" implies that the Service should analyze a complete range of grazing levels—including none at all. *Id*.

MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT—20

Likewise, the "optimum agricultural use" of Clear Lake Refuge may entail lower levels of grazing than previously permitted, or even no grazing. *Id*. Of course, the Service may prohibit any use of a refuge, even if deemed compatible with the refuge purposes, AR 3804, 62635, 64528, 64535. Finally, the provision of the Kuchel Act directing the continuation of "the present pattern of leasing" on the Lower Klamath and Tule Lake National Wildlife Refuges by its express terms does not apply to Clear Lake Refuge. 16 U.S.C. § 695*n*.

Thus, the Kuchel Act does not prevent the Service from evaluating alternatives that reasonably reduce or discontinue grazing at Clear Lake Refuge. To the contrary, it requires the agency to do so. Indeed, the agency has previously considered eliminating grazing on the Refuge at least twice—in 1994 and 1996—including in 1994 when it actually chose to eliminate grazing. AR 65105–18 (1994 EA and CD); 64785–806 (1996 EA and CD). The Service's position now is much like that of the BLM's in *Salazar*, where the agency denied it had the authority to consider a no-grazing alternative even though it clearly did have that power. 2011 WL 4526746, at *14–*15. As in that case, the Court here should find the Service violated NEPA, and by extension the Kuchel Act, by not evaluating a reduced- or no-grazing alternative and thus failing to give "full consideration" to whether grazing is consistent with wildlife conservation.

**D.  The Service is Wrong That It Lacks Authority to Consider Alternatives That Would Reduce or Eliminate Grazing on the West Side of the Refuge by Livestock Authorized on the Modoc National Forest.**

The Service also stated throughout the CCP/EIS and Clear Lake CD that it lacks the authority to prevent cattle that are permitted to graze on the Forest Service's Tucker allotment from entering Clear Lake Refuge without fencing them out. AR 503, 3554, 3560, 3565, 3569, 4908. Once more, the Service's implication is that it could not legally consider eliminating grazing in that area. But here, too, the Service's rationale fails because, pursuant to the agency's

own regulations, grazing on national wildlife refuges is only allowed through permits—not any time livestock happen to wander in. 50 C.F.R. §§ 25.41–45, 29.1. Accordingly, the Service is fully empowered to prohibit unauthorized livestock on the Refuge, regardless of fences. AR 4789; *see* 50 C.F.R. §§ 28.21 (general enforcement authority), 28.31 (general penalty provisions), 28.42 (procedures for impoundment of trespass domestic livestock).

In fact, the Service has affirmatively acted to allow livestock to enter Clear Lake Refuge from the Modoc National Forest through an interagency agreement and annual permission. *Supra* pp. 12–13; AR 503, 26362–67. Moreover, the Service clearly recognizes that it may revoke its permission and eliminate this incidental grazing. *See* AR 51758 (Internal comments on draft Clear Lake Grazing CD noting that if the Service "wanted to discontinue this use, the CCP process would provide a vehicle"), 50806 ("do we actually WANT to continue this use"?). For all these reasons, the Service's refusal to analyze any reduction of livestock grazing at Clear Lake lacks a rational basis, and violates NEPA, the Kuchel Act, and its own regulations.

### III.  THE SERVICE VIOLATED NEPA AND THE REFUGE ACT BY FAILING TO ADEQUATELY CONSIDER IMPACTS TO SAGE-GROUSE AND ENDANGERED SUCKER SPECIES AT CLEAR LAKE.

An EIS must disclose the environmental consequences of the proposed action. 40 C.F.R. § 1502.1. The agency's statements "shall be supported by evidence that the agency has made the necessary environmental analyses." *Id*. High quality information must be made available to the public before an agency makes its decision and takes action. *Id*. § 1500.1(b). Accurate scientific analysis and public scrutiny are essential to implementing NEPA. *Id*. In the CCP/EIS, the Service failed to fully analyze the direct, indirect, and cumulative effects to sage-grouse and suckers from its management of Clear Lake Refuge, violating NEPA's "hard look" requirement. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076–79 (9th Cir. 2011);

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159, 1169–73 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).

The Service's refuge planning policy also directs the agency to "[a]ssess the environmental consequences (direct, indirect, and cumulative) of implementing each alternative as required by NEPA." AR 64545. A compatibility determination must address "[t]he anticipated impact of the use on the national wildlife refuge's purposes and the National Wildlife System mission." 50 C.F.R. § 26.41(a)(8). And the Service's decisions must be made in adherence to all "applicable laws," including NEPA. 16 U.S.C. § 668ee(3); 50 C.F.R. § 25.12 (definition of "Conservation"). Thus, the Service's violations of NEPA also violate the Refuge Act.

### A.   The Service's Determination That Spring Grazing Would Not Affect Sage-Grouse Lacks a Factual Basis, and the Failure to Evaluate Effects of Grazing on Sage-Grouse Nesting Violates NEPA.

The Service incorrectly concluded, without a factual basis, that the newly-authorized spring grazing under the CCP would have no effect on lekking or nesting sage-grouse. It is well-established that spring grazing has the potential to harm sage-grouse during their breeding, nesting, and brood-rearing cycles, both through direct disturbance and indirectly by eliminating critical hiding cover. *See supra* p. 7–8; Braun Decl. ¶¶ 16–17. Moreover, grazing at *any time* in sage-grouse nesting habitat—including during summer and fall—is detrimental to sage-grouse nesting success the following year. Braun Decl. ¶ 17; *see also Salazar*, 843 F. Supp. 2d at 1115. And the new spring grazing season means that the "U" will now be grazed two times each year, though "twice-over" grazing should be avoided. Braun Decl. ¶¶ 16–17; AR 16678–79.

The CCP authorizes grazing of 300 to 500 cattle on the "U" from March 1 to mid-April, which overlaps sage-grouse mating and nesting season. AR 4114. Specifically, this grazing would occur "on the east side of the 'U' that was damaged by the Clear Fire in 2001" on "[t]wo

pastures of approximately 1,500 acres each." AR 3242. But the Service did not analyze impacts to breeding or nesting sage-grouse from this grazing: the agency claimed that "no hens are known to nest in that area due to the lack of sage brush cover." AR 506, 3575.

This statement lacks factual support in the record and indeed is contradicted by the record. The 2001 Clear Fire "burned across 3,800 acres on the [R]efuge." AR 3394. Yet the Service acknowledges that there are still large patches of sagebrush *within the area burned by the Clear Fire*, stating that "[a]bout half of the sagebrush [on the Refuge] is in a large patch on the west side of the 'U' *with the rest in several patches that range from less than 1 acre to roughly 100 acres within the area of the Clear Fire*." *Id.* (emphasis added). In fact, there are many patches of sagebrush within the area where the Service incorrectly states there is a "lack" of such cover. *See* AR 3393, 54249, 54282 (illustrating the mosaic of sagebrush habitat throughout the "U"). In addition, the Service has provided no specific information about where the 1,500-acre spring grazing pastures will be located—and, without specifying where the spring grazing will occur, it lacks a factual basis for stating that no hens nest "in that area." AR 506.

Sage-grouse *are* known to nest throughout the "U," including in the area burned by the Clear Fire. AR 26239–40, 28802. The CCP/EIS identifies only about 1,000 acres on the "U" as "non-sagebrush," AR 3392, but also admits that sage-grouse may nest in "non-sagebrush habitat." AR 938, 952, 3831; *see also* 26244, 51909, 68443 (describing sage-grouse nests in the Clear Lake area under rabbitbrush, bunchgrasses, and juniper).

Because the Kuchel Act declares that the Clear Lake Refuge is "dedicated to wildlife conservation," 16 U.S.C. § 695*l*, and the Refuge was created as a breeding ground for sage-grouse, AR 502, 3147, 65522, the NEPA analysis must *actually consider sage-grouse conservation. Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1109 (9th Cir. 2010) ("the

considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis"). Consequently, the Service's decision to avoid a "hard look" at impacts from the new spring grazing on sage-grouse breeding and nesting was arbitrary and capricious, flying in the face of the facts in the record. *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 878 (9th Cir. 2009) ("While our deference to the agency is significant, we may not defer to an agency decision that is without substantial basis in fact" (internal citation omitted)).

With respect to fall grazing, the CCP/EIS acknowledges that grazing during the summer and fall would "reduce the density of native and exotic grasses" and "reduce grass heights." AR 4116. But it simply does not consider the indirect impacts to nesting sage-grouse in the following spring, including whether 7 inches of residual grass height would remain following grazing to ensure sage-grouse nest security. *See* Braun Decl. ¶ 17. Impacts to nesting sage-grouse on the "U" are a major risk of authorizing livestock there. The Service's failure to consider this aspect of its decision violates NEPA, and thus the Refuge Act.

**B. The Service Violated NEPA by Ignoring Impacts to Suckers and Their Habitat.**

The Service also ignored impacts to Lost River and shortnose suckers and their habitat on Clear Lake Refuge. Despite determining that one of the two main planning issues for the Refuge was to "[e]nhance and sustain sucker populations," AR 3177, the Service claimed that "there is no management action for [it] to implement related to sucker populations." AR 3245. This conclusion breaks with the agency's past treatment of endangered suckers at the Refuge and cannot be squared with evidence in the record showing the potential for harm to suckers from livestock grazing—a management action that the Service obviously *does* implement.

The Service's previous analyses of livestock grazing at Clear Lake Refuge recognized potential negative impacts to Lost River and shortnose suckers and their habitat from authorized

grazing. AR 65110, 65114, 64793 (1994 and 1996 EAs noting that removal of grazing at the

Refuge would benefit suckers). Even the Service's exceedingly brief treatment of grazing at

Clear Lake in its 2017 BA for the CCP/EIS concedes that grazing may affect these species and

their critical habitat through contamination of aquatic and seasonal wetland habitats "that provide

refugia habitat during different parts of the life cycle." AR 126.

Furthermore, the shallow water habitat along the Clear Lake Reservoir shoreline—which

livestock have access to at all times they are present on the Refuge—is critical to the suckers'

larval stage, recognized as a "primary constituent element" of their habitat. *See supra* p. 14.

Grazing and wading livestock trample these areas and disturb the areas that sucker larvae inhabit.

*Id.*; AR 507, 825–27, 112920. Grazing also removes vegetation that provides cover to sucker

larvae when flooded. AR 3321, 56094. Nowhere does the CCP/EIS consider these impacts.

Instead, the Service stated that it "has no empirical data that shows current grazing

practices adversely affect" sucker habitat. AR 508, 3571. While it is not clear what the Service

considers to be "empirical data," there is ample evidence in the record of livestock impacts to

sucker habitat. Besides the facts described above, the Service is aware that the livestock grazing

it allows on the west side of the Refuge has frequently caused violations of the utilization

standard required by the Incidental Take Statement in the 1997 BO that governs grazing on the

Tucker allotment. AR 825, 28918, 28920; Connor Decl. Ex. 1 at 116, 130.

The Service must evaluate even qualitative and anecdotal data in considering impacts of

grazing on suckers. *See Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136,

1147 (9th Cir. 2007) ("in the absence of [a quantitative] study, credible anecdotal evidence

represents the 'best scientific ... data *available*' and cannot be ignored" (emphasis original));

*Klamath Siskiyou Wildlands Ctr. v. Grantham*, 642 F. App'x 742, 744 (9th Cir. 2016) ("while

the [Forest Service] lacked *quantitative* evidence of the past or likely future impact of drifting

cattle, the record was replete with anecdotal and photographic evidence suggesting impact from

drifting cattle, which should have been discussed" (emphasis original)).

In sum, this Court should conclude—as did an internal reviewer—that the potential

impacts to suckers were not "accurately covered" in the CCP/EIS. AR 13519.

### C. The Service Violated NEPA and the Refuge Act's Compatibility Requirement by Failing to Analyze Cumulative Impacts to Sage-Grouse or Suckers from Grazing on the Adjacent National Forest.

A cumulative impacts analysis is one of the foundational requirements of NEPA. In an

EIS, the Service must disclose to the public "[w]hether the action is related to other actions with

individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A

cumulative impact results from the incremental impact of the proposed action when added to

other past, present, and reasonably foreseeable future actions. *Id.* § 1508.7. Impacts can result

from individually minor actions taking place over a period of time. *Id.* The EIS must "fully

address" cumulative impacts. *Te-Moak Tribe v. U.S. Dep't of the Interior*, 608 F.3d 592, 602 (9th

Cir. 2010); *see also Lands Council*, 395 F.3d at 1027 (consideration of cumulative impacts is

essential to a "hard look").

The Service must also consider cumulative impacts in order to comply with the Refuge

Act's compatibility requirements. 50 C.F.R. § 26.41(a)(8). The Service's policy guidance

specifies that a CD must analyze "not only the direct impacts . . . but also the indirect impacts

associated with the use and the cumulative impacts [in conjunction with] uses of adjacent lands

or waters that may exacerbate the effects of a refuge use." AR 64527, 64532. Cumulative

impacts "over time may become quite substantial." AR 64532. Thus, uses that might otherwise

be compatible with refuge purposes may exceed the compatibility threshold "when considered

cumulatively in conjunction with other existing or planned uses." AR 64526–27.

Neither the CCP/EIS nor the Clear Lake Grazing CD addresses the cumulative impacts of livestock grazing. *See* AR 502–14 (CD), 3705–29 (CCP/EIS). In short, the Service viewed the effects of its grazing management on Clear Lake Refuge in a vacuum, ignoring potentially harmful impacts from grazing in nearby areas. This is a material omission for sage-grouse, as well as Lost River and shortnose suckers—species that rely on habitat both within the Refuge and in the surrounding lands and waters outside it.

For instance, while the only known sage-grouse lek is located on the Clear Lake "U," and sage-grouse also nest and raise broods on the "U" and elsewhere on the Refuge, surrounding areas on the Modoc National Forest, including the Clear Lake Hills, also provide important habitat for the population. *Supra* p. 11. Management actions by the Forest Service, including authorized livestock grazing on the Tucker, Carr, Clear Lake, and Mammoth allotments adjacent to the Refuge, and grazing infrastructure there, threaten the persistence of the Clear Lake sage-grouse population by affecting these other areas of the sage-grouse's range. An EIS must consider cumulative impacts "regardless of what agency undertakes such other actions." 40 C.F.R. § 1508.7. Consequently, the Service had to analyze what impacts livestock grazing on the Modoc National Forest surrounding Clear Lake Refuge was having on sage-grouse from the Refuge to understand whether the grazing the *Service* authorized would actually promote the conservation of these imperiled birds.

Instead, the Service acted "like a horse with blinders, hampered by a restricted field of vision." *See W. Watersheds Proj. v. Bennett*, 392 F. Supp. 2d 1217, 1223 (D. Idaho 2005) (agency violated NEPA by not considering impacts to a declining sage-grouse population from management in adjacent areas). The CCP/EIS failed to "show the big picture." *W. Watersheds*

*Proj. v. Rosenkrance*, No. 09-cv-00298-EJL, 2011 WL 39651, at *13 (D. Idaho January 5, 2011)

(when agency did not consider impacts to bull trout and sage-grouse from grazing on adjacent

allotments, it violated NEPA); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291,

1306-06 (9th Cir. 2003) (NEPA analysis for timber sale was inadequate where it failed to

consider the cumulative impacts of the sale on spotted owl habitat on adjacent forest). An agency

has discretion to determine the *scope* of its cumulative impacts analysis. *Kleppe v. Sierra Club*,

427 U.S. 390, 413–14 (1976). But here there was no cumulative impacts analysis at all. *See* AR

3705–29 (cumulative impacts section of CCP/EIS has no discussion of grazing impacts to the

Clear Lake sage-grouse population).

 By ignoring everything beyond the Refuge boundaries, the Service failed to disclose

impacts to sage-grouse at relevant biological and management scales. For example, the Service

excluded impacts from all other managed lands within the AMA, which is the area of focus

under the local working group sage-grouse plan, even though the plan expressed that "[a]ny

meaningful conservation strategy" for the Devil's Garden/Clear Lake sage-grouse population

"must be coordinated among all landowners, public and private." AR 2622, 51922.

 Likewise, the CCP/EIS did not consider impacts to the Devil's Garden/Clear Lake PMU

as a whole, or discuss implications for recovery within the larger Klamath OR/CA population.

Lack of analysis of impacts to sage-grouse at the population level renders an EIS void. *See*

*Salazar*, 843 F. Supp. 2d at 1126–28 (cumulative impacts discussion did not satisfy NEPA where

BLM did not discuss impacts of authorized grazing on sage-grouse within the larger population);

*W. Watersheds Proj. v. Jewell*, 56 F. Supp. 3d 1182, 1190 (D. Idaho 2014) (same).

 In a similar manner, the Service erred by disregarding impacts to Lost River and

shortnose suckers and their critical habitat. These species also rely on areas outside Clear Lake

Refuge for crucial aspects of their life history, namely spawning activities in the Willow Creek watershed followed by the downstream migration of newly-hatched larvae to Clear Lake. *See supra* pp. 14–15. Willow and Boles Creeks flow through predominantly public lands on the Modoc National Forest. *Id*. The Service overlooked the effects of livestock grazing, water impoundments and diversions—or any other management activity authorized by the Forest Service that cause harmful effects to suckers or their designated critical habitat in addition to the impacts from the Service's management of Clear Lake Refuge. Connor Decl. Ex. 1 at 108–13. Taken together, these activities have the potential to significantly impact suckers, and cannot be ignored. *See Te-Moak Tribe,* 608 F.3d at 605.

## IV.    THE SERVICE'S COMPATIBILITY DETERMINATION FOR GRAZING AT CLEAR LAKE REFUGE VIOLATES THE REFUGE ACT.

The Service's determination that livestock grazing is compatible with and contributes to the purposes of the Clear Lake Refuge is arbitrary and capricious, and violates the Refuge Act because its justifications are unsupported, contrary to evidence in the record, and disregard available information.

Under the Refuge Act, each refuge must be managed to ensure that the purposes for which the refuge was established are carried out. 16 U.S.C. § 668dd(a)(4)(D). The Service may permit any use that is "compatible" with the major purposes of a refuge, but "shall not" permit or renew a use unless it has determined the use is compatible. *Id.* §§ 668dd(d)(1)(A), (d)(3)(A). A compatible use is a use that "based on sound professional judgment . . . will not materially interfere with or detract from the fulfillment" of the refuge purposes. *Id.* § 668ee(1). A determination made in the Service's sound professional judgment must be consistent with "principles of sound fish and wildlife management, available science and resources, and adherence to the [Refuge Act] and other applicable laws." *Id.* § 668ee(3); 50 C.F.R. § 25.12; *see*

*also* AR 64526 (Service policy guidance specifying that, in the exercise of sound professional

judgment, a refuge manager "will use available information"). "The justification for the

determination . . . must provide a logical explanation." AR 64534.

Besides failing to show livestock grazing was a compatible use at Clear Lake Refuge, the

Service failed to demonstrate that grazing *contributes to the achievement of* the Refuge's

purposes, namely, the conservation of native birds and other wildlife. The Service may only

authorize an economic use of a refuge if it additionally meets that heightened standard under 50

C.F.R. § 29.1. *See Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 289 (D. Del. 2011); *see*

*also* AR 44358–59 (Memorandum from National Wildlife Refuge System Chief mandating

policy of allowing commercial agriculture only where it "specifically contributes to wildlife

objectives"). Livestock grazing is an economic activity. AR 504, 64520; *see also* 50 C.F.R. §

25.12(a). Thus, unlike other federal lands that are managed for multiple use, at Clear Lake

Refuge, commercial livestock grazing must affirmatively contribute to wildlife conservation and

Refuge purposes in order to be approved. *See* AR 3134–35.

### A. The Service's Approval of So-Called "Restoration" Grazing on the U's Upland Habitat Lacks a Rational Basis in Fact.

Foremost, the Service's explanation that grazing would be used to restore sagebrush

steppe habitat for sage-grouse and other species at Clear Lake Refuge lacks support in the record.

The agency claimed that grazing would "reduce the extent of exotic annual grasses (invasives);

[and] help rehabilitate previously burned sagebrush habitats by providing native shrubs,

perennial bunchgrasses, and forbs a competitive edge." AR 502; *see also* 3556 ("[g]razing would

be used as a tool to promote sage-steppe habitat"). To justify this conclusion, the Service relied

heavily on a 3-page "Final Research Update" by a University of California agricultural extension

investigator, which describes a grazing experiment and purports to show that livestock could be

used to target invasive annual grasses on the Clear Lake "U," thereby favoring native grasses and sagebrush. *See* AR 505, 3240, 3556, 52071 (Final Research Update). But the Service's reliance on the unpublished, non-peer-reviewed Final Research Update is seriously flawed.

First, the Service misrepresents the actual findings of that Update in the CCP/EIS and CD. For instance, the Service says the grazing experiment resulted in "no change in bare ground," AR 3240, 4116, when in fact bare ground increased under the intensive grazing by an average of 8.5% each year. AR 52071–72, 55470 (14% in year 1 and 3% in year 2). This is a critical point because cheatgrass and medusahead thrive in disturbed soils. *See supra* p. 8. The Final Research Update also claims modest increases in bunchgrasses and forbs, but some of those resulted from experimental seeding—something the CCP does not provide for. AR 52071–72, 55469–71. And while the short-lived experiment did decrease annual grasses both years, the Final Research Update does not address the long-term effectiveness of targeted grazing. *Id.*

There is simply nothing that demonstrates the experimental grazing technique would have any benefit beyond the year it occurred, similar to another experiment that targeted cheatgrass and medusahead on the "U" with herbicide. That treatment reduced annual grasses by 60 to 70 percent the year of application, but "annual grass populations rebounded to untreated levels" the following year. AR 3240, 49319, 49322, 54270. The Service points to nothing to support the idea that grazing can *restore* sage-grouse habitat by reducing invasive species over an extended period of time—and, in fact, the scientific literature does not support the idea that grazing can reduce the presence of invasive annual grasses. Braun Decl. ¶ 18.

There is also nothing to support the idea that an experiment that used an 80-acre pasture can be replicated on two 1,500-acre pastures. Indeed, the investigator cautioned that the results "would be difficult to replicate" with cows on an area greater than 160 acres. AR 52072. She

admitted that small pastures are required to force livestock to eat medusahead—something cows do not like to do because of its undesirable traits. AR 26052, 52071–72, 52085–86, 57977–78 (noting that prescriptive grazing should be used on "a small patch work"); *see also* AR 3204, 3240, 3565 (stating that "this type of grazing program might be more effective at a larger scale if sheep were used for grazing instead of cattle").

Despite that admonition, the CCP unleashes a super-sized version of the experiment on the tiny sage-grouse population at Clear Lake Refuge, using two 1,500 acre pastures on the "U." AR 503, 3242. In other words, each of the pastures authorized by the Service is nearly 20 times larger than the pasture in the grazing experiment and nearly ten times the size of largest pasture that the agricultural extension investigator predicted would be feasible. The CCP/EIS and CD do not address that profound discrepancy, or explain why cows would actually target invasive species in an area that large, rather than simply eating the native bunchgrasses that they prefer. AR 3565 (noting that during targeted grazing, livestock also graze non-pest (*i.e.* native) species). After all, throughout the "U," native species dominate or make up a large percentage of the vegetation. AR 3393–94, 57975–76, 57982.

The experiment also used a different season, shorter time period, and far fewer cows than the CCP approved for so-called "restoration" grazing, and employed protein supplement to increase distribution. AR 3565. All of these differences and discrepancies demonstrate that the slender reed on which the Service leans cannot support its conclusion that grazing will improve the condition of the uplands on the Clear Lake "U."

At the same time the Service made its case for targeted grazing based on the Final Research Update, it ignored overwhelming contradictory evidence indicating that grazing causes the introduction, persistence, and spread of invasive species rather than reducing them. *See, e.g.,*

*supra* p. 8. It refused to discuss a recent peer-reviewed study that WWP provided (Reisner et al. 2013), which found "no evidence" that cattle grazing reduced cheatgrass, but "strong evidence" that increasing cattle grazing intensity promoted it. 765, 814, 834, 1895, 1904; *see also* AR 26052 ("Continued grazing of medusahead-dominated grasslands is extremely deleterious on remnant perennial grasses because of differential grazing preference"). The Service is obligated to consider such "available science and resources" but did not. 16 U.S.C. § 668ee(3); 50 C.F.R. § 25.12; *see also* 40 C.F.R. § 1502.9(b) (agency must discuss reasonable opposing viewpoints). Instead, the Service hung its hat on an inapplicable experiment, even acknowledging that targeted grazing on the "U" would "require[] a lot of luck to succeed," while ignoring contradictory evidence. AR 51943. In sum, the Service failed to convincingly show that livestock grazing on the "U" would restore habitat rather than interfere with natural recovery, and its determination that grazing is a compatible economic use violates the Refuge Act.

### B. The Clear Lake Grazing CD Does Not Demonstrate that Grazing in Shoreline Habitat Contributes to Refuge Purposes Given its Serious Conflicts with Sage-Grouse, Suckers, and Other Wildlife.

The Service also violated the Refuge Act because it failed to demonstrate that the grazing it allows in shoreline habitats benefits native birds or other wildlife. To the contrary, livestock damage riparian habitat and compete with sage-grouse, mule deer, and pronghorn for scarce resources along the edges of Clear Lake Reservoir, detracting from Refuge purposes.

The shoreline is valuable habitat and protecting it is one of the CCP/EIS's stated objectives for Clear Lake. AR 4822. During brood-rearing season (summer and fall), the lakeshore is an important foraging area for sage-grouse, in large part because of the availability of forbs. *See supra* pp. 7, 11; AR 54283, 55459–61. For the same reason, pronghorn and mule deer congregate there. AR 48810, 48825, 48827.

However, grazing during the same period—when "most of the cattle use is [also] on the shoreline"—conflicts with these species' needs. AR 503, 506–07, 3570–71 (noting that there is "competition for food resources on the lakeshore between cattle, mule deer, pronghorn and sage grouse" and that "[m]ore forage for native species would be available along the lakeshore if it were not eaten first by cattle."). When cattle are excluded from these areas, "grasses and forbs grow tall and become available to deer and sage-grouse broods." AR 507; *see also* AR 48820 48825, 65110 (describing recovery of woody vegetation when livestock were prevented from accessing the shoreline). Grazing reduces "hiding cover in the form of tall herbaceous plants close the lakeshore [that] is essential for grouse broods to utilize lakeshore forbs." AR 59021. Yet, the Service does not even assert that this shoreline grazing is for "restoration"; unlike the claimed benefit of grazing in the uplands, it is "not for noxious weed control." AR 503

Under the CCP/EIS, livestock can access the shoreline during the spring and summer, when sucker larvae rely on shallow water habitat in 4 to 20 inches of water. *See supra* p. 14; AR 503. Wading livestock cause turbidity and damage soils and vegetation in these shallow water habitats. AR 507, 3571, 3583, 65106–118. As a commercial activity, livestock grazing at Clear Lake Refuge must benefit wildlife. But here, the Service has failed to provide a logical explanation or rationale for allowing livestock grazing on the Clear Lake shoreline where it harms endangered suckers and their critical habitat. Thus, the Clear Lake Grazing CD is arbitrary and capricious for this reason, too, and violates the Refuge Act.

## CONCLUSION

For all the reasons set forth, Plaintiff WWP requests that the Court grant its motion for summary judgment, and hold unlawful and vacate the Clear Lake Grazing CD as well as the Klamath Refuges CCP/EIS and ROD as they relate to livestock grazing at Clear Lake Refuge.

Dated: May 17, 2018                    Respectfully submitted,

                                        s/ Paul D. Ruprecht
                                       Paul D. Ruprecht (OSB #132762)
                                       Western Watersheds Project

                                        s/ David H. Becker
                                       David H. Becker (OSB #081507)
                                       Law Office of David H. Becker, LLC

                                       Attorneys for Plaintiff WWP